UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____X

KARINA GARCIA                                    11 CIV 6957 (JSR)

BENJAMIN BECKER                                  **SECOND AMENDED**
                                                 **COMPLAINT**
MICHAEL CRICKMORE
                                                 **JURY TRIAL**
MARCEL CARTIER                                   **DEMANDED**

BROOKE FEINSTEIN                                 **ECF Case**

YARI OSORIO

YAREIDIS PEREZ

CASSANDRA REGAN

TYLER SOVA

STEPHANIE JEAN UMOH

       *as Class Representatives*
       *on behalf of themselves and others*
       *similarly situated*

       Plaintiffs,

          v.

MICHAEL R. BLOOMBERG
*in his official and individual capacities*

The CITY OF NEW YORK

RAYMOND W. KELLY
*In his official and individual capacities*

JANE and JOHN DOES 1 – 40
*In their official and individual capacities*

       Defendants.

_____X

1

**SECOND AMENDED COMPLAINT**
**(Class action constitutional and civil rights lawsuit)**

1.  As a new protest movement for social and economic justice sweeps New York City and the country, the Police Department of the City of New York (NYPD) has engaged in an unconstitutional effort to disrupt and suppress the ability of the people to come together and advocate for social change using the time-honored methods of mass assembly and collective action.

2.  On October 1, 2011, the NYPD engaged in a premeditated, planned, scripted and calculated effort to sweep the streets of protesters and disrupt a growing protest movement in New York. This lawsuit seeks to stop the NYPD from taking illegal actions against mass assembly protest.

3.  As seen in the movements for social change in the Middle East and Europe, all movements for social justice, jobs, and democracy need room to breathe and grow and it is imperative that there be a halt to law enforcement actions used to shut down mass assembly and free expression of the people seeking to redress grievances.

4.  On October 1, 2011, the NYPD engaged in a mass false arrest of approximately 700+ persons who participated in, or were in proximity to, a demonstration and march crossing over the Brooklyn Bridge.

5.  After escorting and leading a group of demonstrators and others well out onto the Brooklyn Bridge roadway, the NYPD suddenly and without warning curtailed further forward movement, blocked the ability of persons to leave the Bridge from the rear, and arrested hundreds of protesters in the absence of probable cause. This was a form of entrapment, both illegal and physical.

6. That the trap-and-arrest mass arrest was a command-level-driven intentional and calculated police operation is evidenced by the fact that the law enforcement officials who led the demonstration across the bridge were command officials, known as "white shirts."

7. That the trap-and-arrest mass arrest was an intentional and calculated police operation is also evidenced by the charade the police conducted – and themselves duly videotaped -- of speaking inaudibly into a bullhorn that could not be heard mere feet away from the officer, given the ambient noise.

8. Although a TARU officer standing right next to an officer with a handheld bullhorn captured the warnings on video, no fair notice was heard or received by the hundreds in the class and thousands in the march, given the ambient noise and their distance. The bullhorn was inaudible mere feet away. See Exh. F. (video footage from base of bridge showing bottleneck at base of pedestrian walkway, crowd waiting to enter onto pedestrian walkway, officer with bullhorn is inaudible from mere feet away, officers and command staff turning and leading demonstrators onto roadway)

9. The NYPD knew no audible communication was given. The NYPD also knew that the Constitution requires that any ostensible command must be heard by those who are expected to be bound by it.

10. Instead, the NYPD engaged in a performance, videotaped it, and sprang their trap. They then set their PR machine into motion, widely distributing edited videos of events to spin a false narrative of events to the public and media.

11. The NYPD, as a matter of policy and practice, engages in unconstitutional tactics to disturb, disrupt, penalize, infringe upon and criminalize constitutionally protected speech and assembly.

12. The NYPD's trap and detain actions interfere with freedom of association, assembly, speech and free movement.

13. The NYPD employs unconstitutional tactics to trap protesters, and others in physical proximity, on all sides, seize, detain and arrest those trapped/seized.  These actions are accomplished through force and threat of force in order to deprive, interfere with, and deter the exercise of constitutionally protected rights.

14. Trap and arrest involves the use of police lines against targeted protests to trap protesters and others, in the absence of warnings or orders calculated to reach those subject to arrest. As a generalized trap without warning, the tactic captures persons indiscriminately and without regard to the existence of particularized probable cause to arrest.

15. The trap and arrest tactic deprives those arrested of fair notice that they may be subject to arrest and does not provide any opportunity to comply with any directive. In short, persons conforming their conduct to the law cannot avoid being caught in a mass false arrest.

16. The conduct challenged herein is neither aberrational nor the consequence of overzealous but well-intentioned law enforcement. It is the implementation of a plan to disrupt political assembly and activities. The October 1, 2011 mass arrest was conducted just 13 days after the beginning of the Occupy Wall Street protests that were rapidly growing.

17. When named plaintiff BECKER asked why the group was being arrested, one officer explained that they were being arrested because otherwise "you'd go right back down there." When BECKER responded that it was not illegal to be demonstrating as part of Occupy Wall Street, the officer said that if it was up to her she would not have arrested them, but "if we let you go you will just keep protesting."

18. When plaintiff REGAN was at the precinct being processed for release, a police officer stated, "next time you'll think twice about going out to protest."

19. The NYPD not only falsely arrested hundreds in a mass violation of Fourth Amendment rights, it illegally terminated demonstration activities in a mass violation of First Amendment rights.

20. The NYPD took a spirited and moving demonstration and sought to extinguish it. A protest march is a moveable demonstration engaging with the public as it proceeds, in a pristine and classic form of democratic grassroots action and assembly. As a march continues it collects energy, collects participants, absorbing those who see it and hear it going by, who are moved by the political message and want to make common cause and join in.

21. The NYPD terminated the march, the message, the opportunity to communicate, and the opportunity for people to join together at that moment. The NYPD conducted a mass false arrest and extinguished the demonstration activity in an attempt to stop and prohibit further growing democratic and political collective action.

22. These unconstitutional actions also send a threatening message to the public that may be interested in making common cause with the political actions. That message is that free speech activities are criminalized by the police department and that joining in lawful First Amendment protected activities comes at the risk of police violence and false arrest.

23. These unconstitutional actions create a substantial chilling effect and deterrent to First Amendment protected activity as they burden free speech activities with the risk of arrest, of being wrongfully subject to the criminal process of the city, of being threatened with physical harm by the police, being bound with handcuffs and having one's identification and

association with a demonstration be collected and recorded by the police and transferred to federal and other law enforcement authorities for data warehousing and collection.

24. This police conduct is anathema to democracy. These blatantly unconstitutional tactics have been ratified by the highest policy makers from the Chief of Police to the Mayor of New York City. Mayor Michael Bloomberg stated of the October 1 mass arrest, "The police did exactly what they were supposed to do."

25. This complaint seeks, in addition to monetary compensation, injunctive relief enjoining defendants from engaging in the challenged conduct in the future, an order nullifying the arrests, and expungement of all arrest records.

## JURISDICTION

26. This civil rights action is brought pursuant to 42 U.S.C. § 1983 and § 1988. The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (Federal Question), 28 U.S.C. § 1343(3) and (4) (Civil Rights), 28 U.S.C. § 1332(d)(2) (Diversity of Citizenship; Class Actions) and 28 U.S.C. § 1367 (Supplemental Jurisdiction).

27. The amount in controversy exceeds the sum or value of $5,000,000. On information and belief, the percentage of putative class members who reside outside of New York State is greater than one-third.

28. Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§2201 – 2202 and Fed.R.Civ.P. 57.

## VENUE

29. Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391 as the municipal defendant and is deemed to reside therein,

defendant BLOOMBERG resides therein, and as a substantial part of the events or omissions giving rise to the claims occurred therein.

## PARTIES

### Named Plaintiffs

30. Plaintiff KARINA GARCIA is a public high school teacher and resides in Chelsea in New York City.

31. Plaintiff BENJAMIN BECKER is an adjunct instructor at the City College of New York and a graduate student at the CUNY Graduate Center and resides in Chelsea in New York City.

32. Plaintiff MARCEL CARTIER is a student at Bronx Community College, a hip hop artist, and community activist and resides in the Bronx, New York.

33. Plaintiff Dr. MICHAEL CRICKMORE is a neuroscientist at a research university in New York City, where he resides.

34. Plaintiff BROOKE FEINSTEIN is a resident of Iowa City, Iowa and on October 1, 2011 was in New York City on vacation.

35. Plaintiff YARI OSORIO is an unemployed college graduate looking for work, and resides in Queens, New York.

36. Plaintiff YAREIDIS PEREZ is an administrative assistant and events coordinator at a museum in New York City, and resides in Jersey City, New Jersey.

37.  Plaintiff CASSANDRA REGAN is a recent graduate with a Masters degree in early childhood education and a community organizer and resides in Queens, New York.

38. Plaintiff TYLER SOVA is a social worker residing in Brooklyn, New York.

39. Plaintiff STEPHANIE JEAN UMOH is a college graduate and aspiring actress residing in Harlem in New York City.

40. Each of the above-referenced plaintiffs was peacefully and lawfully participating in the demonstration and march when the police led, escorted and permitted the march onto the Brooklyn Bridge roadway.

41. None of the plaintiffs heard warnings or orders to not proceed upon the bridge roadway.

42. Each understood their passage upon the roadway to be permitted by police.

43. After leading the demonstration well out onto the Brooklyn Bridge, police without cause, notice and opportunity to comply with any order, trapped and arrested each plaintiff, boxed each plaintiff in without avenue of exit, and falsely detained and arrested each plaintiff in the absence of probable cause.

**Named and Unnamed Defendants**

44. Defendant MICHAEL R. BLOOMBERG is the Mayor of New York City and the chief policymaker for the CITY OF NEW YORK and its departments and agencies, including the NEW YORK CITY POLICE DEPARTMENT. Mayor BLOOMBERG has caused and/or approved and/or ratified the unconstitutional conduct challenged herein. He is sued in his official and individual capacities.

45. Defendant CITY OF NEW YORK is a municipal corporation within the State of New York.

46. Defendant RAYMOND W. KELLY is the Commissioner of the New York City Police Department, which is an agency of the City of New York. KELLY is a policymaker for the CITY of NEW YORK and the NEW YORK POLICE DEPARTMENT. Commissioner KELLY has caused and/or approved and/or ratified the unconstitutional conduct challenged herein. He is sued in his official and individual capacities.

47. Defendants JOHN or JANE DOES 1 – 30 are unidentified New York City police officials, officers or command staff who caused or did arrest the plaintiff class. These as-yet-

8

unidentified defendants engaged in the mass arrest notwithstanding the absence of probable cause or lawful justification. These defendants knew that the NYPD had permitted and/or conveyed permission to the marchers to conduct their march and, ultimately, to be upon the bridge roadway. These defendants knew that police had escorted and led marchers onto the roadway and then, minutes later, arrested the plaintiff class for being present upon the roadway onto which police had just led and escorted them. These defendants are sued in their individual and official capacities.

48. Defendants JOHN or JANE DOES 31 – 40 are unidentified law enforcement or security officials, officers or agents who, although not employed by the NYPD, did engage in joint action with the NYPD and its officials, officers and agents to cause the mass false arrest of the plaintiff class.

## CLASS ACTION ALLEGATIONS

49. The proposed class is: All persons who were arrested on or at the Brooklyn Bridge in the mass arrest conducted on October 1, 2011.

50. The proposed class and their claims satisfy the requirements of Rule 23(b)(3) and, alternately, Rule 23(b)(2).

51. The proposed class of persons, which is composed of approximately 700+ persons, is too numerous for joinder.

52. The defendants conducted a mass arrest of the class, as a group, and in so doing acted on grounds that apply generally to the class. The decision to arrest the class is based on facts and circumstances common to the class. The decision, *per se*, pertained to the class.

53. The class claims that the members' Fourth Amendment rights against false arrest and false imprisonment were violated raise common questions of law and fact that predominate over

any questions affecting only individual members. The existence or absence of probable cause is a common issue relevant to liability.

54. The class claims that the mass group arrest violated the class' and members' First Amendment rights to engage in, observe or associate with free speech and assembly activities (i.e., through physical proximity), raise common questions of law and fact that predominate over any questions affecting only individual members.

55. The class claims that the mass group arrest violated the class' and members' Due Process rights, by permitting and leading a protest march onto the Brooklyn Bridge whereupon police arrested the class for being present upon the bridge roadway which police had just permitted access to and led them upon, raise common questions of law and fact that predominate over any questions affecting only individual members.

56. The class claims that the mass group arrest constituted false arrest under New York law raise common questions of law and fact that predominate over any questions affecting only individual members. The state law false arrest claim is based on the same decision to mass arrest the plaintiff class, and the same underlying probable cause determination, as is the federal section 1983 claim. A section 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures including arrest without probable cause, is substantially the same as a claim for false arrest under New York law. Consideration of the New York law false arrest claim and related state law claims under pendant jurisdiction will not substantially affect the efficacy of the class action.

57. The class claims that the mass group arrest was a calculated and deliberate course of false arrest, put into effect in order to retaliate against all those who would engage in the mass

protest from Wall Street or associate with said protest, raise common questions of law and fact.

58. The claims of the named plaintiffs are typical of the claims of the class, as each was engaged in or associating with peaceable and lawful free speech and assembly activity when each was subjected to false arrest on October 1, 2011 as part of the same police sweep against the class as a group.

59. The named plaintiffs have a strong interest in the outcome of this action, have no conflicts of interest with the plaintiff class, and will fairly and adequately protect the interests of the class.

60. The named plaintiffs are represented by the undersigned counsel and with the attorneys of the Partnership for Civil Justice Fund. Undersigned counsel has successfully litigated a wide range of complex federal court constitutional rights matters, a substantial part of which focus on the rights of protesters to engage in free speech and dissent. Undersigned counsel was lead counsel in Becker, et al. v. District of Columbia, et al., Civil Action No. 01 – 00811 (PLF), United States District Court for the District of Columbia (trap and detain tactic used in mass false arrest of approximately 700 persons engaged in or in proximity to protest march) and Barham v. Ramsey, Civil Action No. 02-2283 (EGS), United States District Court for the District of Columbia (trap and detain tactic used in mass false arrest of nearly 400 marchers, protesters and others in Pershing Park, Washington, D.C.). See Barham v. Ramsey, 434 F.3d 565 (D.C. Cir. 2006). These two class actions, as well as multiple additional lawsuits stemming from protest activity that counsel has litigated, have resulted in sweeping equitable relief and reform through settlement terms and resultant statutory reforms, establishing in the nation's capital an unprecedented bulwark against police misconduct in the context of mass

demonstrations. These protections include a ban on the trap and detain tactics challenged here. The Becker case also resulted in what is believed to be the largest financial settlement of a protest case in U.S. history. Counsel for the plaintiffs were lead counsel on the successful lawsuit challenging the City of New York's efforts to ban mass assembly on the Great Lawn of Central Park during the Republican National Convention of 2004, National Council of Arab Americans, et al. v City of New York, et al., Civil Action No. 04 CV 6602 (WHP), United States District Court for the Southern District of New York. Plaintiffs' counsel is also currently counsel on the class action lawsuit challenging the trap and detain tactic used to mass arrest persons demonstrating over the killing of Oscar Grant in Oakland, CA, Spalding, et al. v. City of Oakland, et al., Civil Action No. 11-CV-02867 (TEH), United States District Court for the Northern District of California. Counsel for the plaintiffs has the resources, expertise and experience to prosecute this action. Counsel for the plaintiffs knows of no conflicts among members of the class or between the attorneys and members of the class.

61. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The class is readily defined and prosecution of a class action will eliminate the need of repetitious litigation.

## FACTUAL ALLEGATIONS

62. In advance of the October 1, 2011 march that is the subject of this Complaint, the defendants had knowledge of the Occupy movement, the physical encampment and base of operations at Zuccotti Park, and the fact that persons associated with the Occupy movement had engaged in First Amendment protected activities, including political marches, as a form of political expression and action.

63. In advance of the October 1, 2011 march, on information and belief, defendants KELLY and BLOOMBERG had communicated and conferred regarding how the NYPD would respond to the Occupy related activities, including protest marches.

64. In advance of the October 1, 2011 march, the NYPD had knowledge that a march would occur on October 1, 2011 from Zuccotti Park to the Brooklyn Bridge Park where there was an announced event with speakers including Amiri Baraka, author, poet and playwright.

65. On October 1, 2011 demonstrators began marching from Zuccotti Park near Wall Street, which the demonstrators dubbed Liberty Square. The demonstrators were engaged in mass assembly and collective action including calling for a shifting of resources in society from the 1% who hold the greatest concentration of wealth and corporate power, to the other 99%. The protesters' political chants included "We are the 99 percent" and "Banks got bailed out, we got sold out!"

66. The march moved initially from Zuccotti Park towards the Brooklyn Bridge.

67. The NYPD presence at Zuccotti Park and along the march was substantial, consisting of the deployment of officers on foot, officers on bicycles, officers on motorscooters and/or motorcycles, officers in cruisers and officers in other types of vehicles.

68. Police had staged and arrayed their resources, personnel and assets including officers, weapons, amplified sound equipment and other crowd control devices sufficient for the march.

69. On information and belief, NYPD command staff monitored the movement of the march, including in the police headquarters and in command centers, including mobile command centers. One Police Plaza is located at the base of the Brooklyn Bridge.

70. On information and belief, defendant and Police Commissioner RAYMOND KELLY

monitored the march as it proceeded.

71. On information and belief, defendant KELLY was in communication with subordinate

command staff in the field and in physical proximity to the march.

72. Thousands of people comprised the October 1, 2011 march.

73. The defendants were aware of the start of the march.

74. The NYPD permitted, and did not impede, the start of the march from Zuccotti Park.

75. The NYPD permitted the march to proceed upon the public ways from Zuccotti Park and

through downtown Manhattan.

76. The NYPD permitted the march to proceed to the Brooklyn Bridge and, ultimately, permitted

the march to proceed upon the vehicular roadway of the Brooklyn Bridge.

77. The NYPD used officers, including flanking the march with officers on motorscooters or

motorcycles, to escort the march from Zuccotti Park to the Brooklyn Bridge.

78. The NYPD officers escorting the march "guided" and exercised control over the conduct of

the march through their physical presence, show of police force and authority, and

specifically through the issuance of orders and directives to individuals within the march. See

Defendants' Motion to Dismiss at 12.

79. The march as a whole, and the individuals within the march, understood that the NYPD was

escorting and permitting the march to proceed.

80. As the march proceeded towards the Brooklyn Bridge, the NYPD knew and observed that the

march of several thousand individuals was compliant with police directives and, indeed,

"followed [the police directives]." Id.

81. At points and times, the police directed and permitted marchers to proceed in ways ordinarily prohibited under traffic regulations absent police directive or permission.

82. At some intersections along the march, police blocked vehicular traffic, directing and permitting marchers to cross the street against the traffic signal.

83. Marchers relied on the orders and signals by the police that this, ordinarily prohibited, conduct was at that particular time and place being allowed by the police who were guiding and escorting the march.

84. In general, the marchers relied on the police for directives and indications as to what actions were being permitted at what times, so that they could conform their conduct and comply with the orders and indications being given by police.

85. Later in the march, when police led and escorted and permitted marchers *en masse* onto the roadway of the Brooklyn Bridge, marchers understood that they were being led and escorted and permitted onto the roadway of the Brooklyn Bridge.

86. The police deprived the plaintiff class of any fair notice that following the lead and escort of police across the bridge roadway was somehow prohibited.

87. As the front of the march reached City Hall Park, those in the front of the march crossed Centre Street and moved to the pedestrian walkway or promenade of the Brooklyn Bridge.

88. When the front section of the march encountered the narrow pedestrian walkway of the bridge, there was a natural congestion as the large group began to file onto the smaller walkway. It took some period of time for the first portion of the march to enter upon the walkway, which occurred without disturbance. See e.g., Exh. B (photo image of large

number of marchers entering and on the pedestrian walkway); Exh. C (photo image of

pedestrian walkway packed with marchers while roadway remains clear).[1]

89. At the entrance point to the walkway flowing back across Centre Street, along Park Row and

in the broad sidewalks abutting City Hall Park, thousands more were in procession. This

mass procession had been occurring for a substantial time without any noncompliance. See

Exhs. D and E (photo images of marchers flowing far back from base of the bridge).

90. Police, including command officials and other city officials, stood in an eastbound roadway

at the entrance of the bridge.

91. The police observed the congestion of persons in the roadway near the entrance to the

Brooklyn Bridge promenade.

92. The command officials gave no *audible* warnings or orders to the mass of people assembled.

93. One officer, consulting with a non-uniformed person, spoke inaudibly into a bullhorn that

could not be heard mere feet away from the officer, given ambient noise. See e.g., Exh. F.

(video footage from base of bridge showing bottleneck at base of pedestrian walkway, crowd

waiting to enter onto pedestrian walkway, officer with bullhorn is inaudible from mere feet

away, officers and command staff turning and leading demonstrators onto roadway).

94. Within a period of five minutes, the officer made statements into the bullhorn including at the

end a rapid and quick succession of statements. These generally inaudible statements appear

from TARU video to request that anyone who might have been within earshot leave the

roadway and at the end that failure to comply would result in arrest.

95. The NYPD knew no audible communication was given to the hundreds and thousands

potentially subject to arrest.

---

[1]        Exh. A is an appendix listing all media exhibits and public or NYPD source location for each exhibit
herein.

96. The NYPD also knew that the Constitution requires that any ostensible command must be heard by those who are expected to be bound by it.

97. There was no attempt by the NYPD to communicate a command, order or other message to the whole of the mass of people at the base of the bridge.

98. The set of directives at the entrance to the bridge could have been heard, if at all, by only a handful of people.

99. These directives were not audible, and thus not given, to the vast majority of people congested at the entrance to the bridge.

100.    They were not audible to the hundreds of persons upon the pedestrian walkway.

101.    They were not audible to the thousands of people upon and across Centre Street, and filling blocks of sidewalk space abutting and wrapping around City Hall Park.

102.    They were not audible to the plaintiff class.

103.    The police possess amplified sound equipment sufficient to project and be heard for blocks.

104.    Having initially stood in the eastbound roadway of the Brooklyn Bridge, the command staff and police at the roadway entrance then turned around, and led the midsection[2] of the march across the bridge.

105.    The demeanor of the police officials and command staff leading the march across the bridge was casual and even somewhat jocular, as they casually chatted with each other, some carrying coffee or beverages.  See e.g., Exh. F, Exh. G (video footage of NYPD casually leading demonstration onto roadway), Exh. G-1 (video still image of apparently unconcerned officers chatting), Exh. G-2 (video still image of officer leading march onto roadway while

---

[2]        The original front of the march had entered onto the pedestrian walkway with several hundred others.

carrying beverage), Exh. H (additional video footage showing NYPD leading demonstrators onto vehicular roadway further along on the bridge).

106.    From that moment on, no orders were issued from the police at the roadway entrance for the ongoing flow of marchers to not proceed on the roadway.

107.    The single officer with the hand held battery operated bullhorn  joined the command staff and others leading the march on the roadway across the bridge.

108.    Police continued to escort the march along its side, with no police on the flanks ordering or directing the march they had been escorting that afternoon against entering or being present upon the bridge. On the contrary, these officers - - who had not hesitated at any time during the march towards the Bridge to direct people on the sidewalks when they so desired - - did not warn against entering or continuing upon the Bridge roadway. See e.g., Exhs. I, J, and K (photo images of officers flanking and escorting march along the bridge roadway).

109.    As marchers, including members of the plaintiff class, followed the police officials onto the Brooklyn Bridge roadway, there was no effort by the police to stop the marchers from entering or continuing upon the roadway. On the contrary, NYPD command staff or "white shirts" led the march.

110.    Police permitted the march to proceed upon the roadway of the bridge.

111.    The police led the march across the bridge - - a decision which would hardly be viewed by march participants or observers as unlikely, given that traversing the roadway or a portion of the roadway would have affected an orderly and faster movement of the march across.

112.    When the police turned and led the march onto the roadway, those who could see this actual and apparent grant of permission to follow let out a cheer believing police were permitting them to cross the bridge on the roadway.

113.    Throughout the crowd that was near the entrance to the bridge was heard spontaneous

exclamations excitedly shouted out, "They're letting us [cross the bridge on the road]!" See

e.g., Exh. L (NYPD TARU video as march proceeds upon roadway, captures marcher on

roadway exclaiming to pedestrian marchers "They're allowing us to! They're allowing us

to!")

114.    After the police led and escorted the march onto the roadway, scores of the marchers who

had originally entered upon the pedestrian walkway joined the others on the roadway when it

became clear that police were leading and escorting and permitting marchers to use the

roadway to cross the bridge. See e.g., Exh. M (video of people climbing down to roadway

from walkway entering behind police who are permitting and leading the march).

115.    When police conducted the arrest, they were aware that the group detained included such

persons from the pedestrian walkway.

116.    Plaintiff BECKER marched on the sidewalk to get to the Brooklyn Bridge. Upon

reaching the bridge, the crowd including BECKER came to a stop in the street between City

Hall Park and the entrance to the bridge due to congestion. BECKER did not see or hear any

police at that time. When the crowd began moving again, BECKER followed the people in

front of him forward, entering the roadway of the bridge because he happened to be on the

right side of the crowd. While marching on the bridge, BECKER observed police officers in

front of the group leading it to Brooklyn. From all of his observations, BECKER understood

that the march was permitted to proceed upon the bridge, led by the police.

117.    Plaintiff CARTIER marched on the sidewalk to get to the Brooklyn Bridge. Upon

reaching the bridge, the crowd congested in the area of the City Hall Park and the bridge

entrance. When the crowd began moving again, CARTIER followed the march. He did not

hear any warnings, orders, directives or indications from police that following the march was

not permitted.

118.    Dr. MICHAEL CRICKMORE, marched with the group from Zuccotti Park. Not

favorably disposed towards large and tightly congested crowds, he positioned himself on the

outside or street side of the procession as much as possible. During the portion of the march

from the Zuccotti Park to Brooklyn Bridge CRICKMORE observed that the police frequently

issued directives to stay on the sidewalk, with which he complied. Following and within the

body of the march, CRICKMORE entered upon the roadway of the Brooklyn Bridge. He did

not even know he was upon the roadway of the bridge at first. He was given and heard no

orders or warnings not to be upon that roadway. When he realized he was upon the bridge

roadway, he looked to police for guidance. He noted that, in sharp contrast to before, the

police who were escorting him were simply walking alongside him, giving no orders

whatsoever and making no suggestion whatsoever that proceeding thereupon was

problematic in any way. He understood his presence on the bridge was permitted, based on

the police's evident allowance of the conduct.

119.    Plaintiff FEINSTEIN was visiting New York City from Iowa on vacation with her

husband. They joined the crowd and followed people, marching in the middle of the group.

When crossing the street from City Hall Park to the Brooklyn Bridge, FEINSTEIN observed

police blocking traffic to facilitate the group crossing to the bridge. These were the only

officers she saw at this time. FEINSTEIN continued to follow the crowd and entered the

roadway as she followed the people ahead of her. FEINSTEIN did not even realize she was

on the roadway until she had already proceeded upon it. At that time, FEINSTEIN observed

police officers walking along with the march, which informed her understanding that she was

on the correct, planned route of march. At one point, a police officer was walking immediately to the side of FEINSTEIN. This officer did not say anything to her. FEINSTEIN did not hear or see any warnings or directives from police indicating she was not permitted to be on the roadway.

120.    Plaintiff GARCIA marched on the sidewalk to get to the Brooklyn Bridge. Upon reaching the bridge, the crowd congested in the area of the City Hall Park and the bridge entrance. When the crowd began moving again, GARCIA followed the march. She did not hear any warnings, orders, directives or indications from police that following the march was not permitted. She understood that the group was being permitted to proceed as they were to the intended end point in Brooklyn.

121.    When Plaintiff OSORIO reached the bridge, the crowd congested in the area of City Hall Park and the bridge entrance. When the crowd began moving again, OSORIO followed the march forward. He did not see or hear any police at this time. OSORIO did not realize he was on the roadway of the bridge until he realized that to his left was a separate group of persons marching on the pedestrian walkway. OSORIO subsequently saw police officers walking on the side of the crowd in the roadway. This gave him the understanding that the march was being guided and escorted by the police across the bridge, including on the roadway.

122.    Plaintiff PEREZ observed police officers escorting alongside the march. Upon reaching the Brooklyn Bridge, she marched in the same direction that she observed the escorting police officers to be walking and followed the police and the flow of the march. She heard no orders or warnings or notice not to be on the roadway of the bridge. When on the roadway, the police officers walking alongside the marchers were walking and occasionally talking among themselves. They did not tell her to get off the bridge. As PEREZ continued to follow

the march and the police escort, she observed police walking in front of the march, leading it across the bridge toward Brooklyn. She was shocked and confused when police formed a line, blocking movement, and began to implement the arrest. She could not understand what she had done wrong, given that police had permitted, led and escorted the march without objection.

123.    When Plaintiff SOVA approached the Brooklyn Bridge, he observed marchers entering the pedestrian walkway and the resulting bottleneck. He also observed marchers begin to walk on the roadway of the bridge. After observing what he believed to be several hundred persons entering the roadway, he followed them, knowing that the destination was a park in Brooklyn. During the period SOVA was at the base of the bridge observing others' movements, he did not hear any police orders. He did not hear any orders or directives not to proceed to follow the march on the roadway. When SOVA marched on the bridge roadway he observed officers alongside the march. These officers did not give SOVA or others any directives. The police simply walked forward, in contrast to earlier in the day when he had observed them giving orders for marchers to remain on the sidewalk. The police gave SOVA the impression and understanding that they were permitting and escorting the march across the bridge.

124.    Plaintiff UMOH followed marchers to the Brooklyn Bridge. UMOH observed some marchers splitting towards the left and some towards the right. She was amidst the right side of the crowd and so she followed the marchers proceeding on the right, which happened to be on the roadway. As she entered the roadway UMOH, in the middle of a large crowd of people, did not see any police officers. She did not hear any police directives. Because of her

position within the crowd, she observed only one officer on the bridge up until when she was about to be arrested. That officer did not give any directives or communicate in any way.

125.    The police, having led and escorted hundreds of marchers upon the roadway of the Brooklyn Bridge, mid-way across the bridge arrested over seven hundred people for being present upon the bridge, precisely where the police had led them and permitted them to march.

126.    Prior to terminating the march when it was mid-way across the bridge, the police did not convey that they were going to revoke the actual and apparent permission of the march to proceed.

127.    Midway across the bridge, when the police stopped all forward movement of the march, an officer spoke inaudibly into a bullhorn that could not be heard mere feet away from the officer, given ambient noise.

128.    Again, the NYPD knew no audible communication was given.

129.    The plaintiff class was blocked from forward movement by the police.

130.    The plaintiff class was ultimately prevented from moving backward as the NYPD prevented dispersal through the use of orange netting and police vehicles.

131.    An officer at the front told named plaintiff REGAN, "leave or get arrested." REGAN determined that there was no exit from the back because the police were blocking exit. She told the officer that they wanted to leave but that they were blocked on the back side too, and asked how they were to leave. The officer merely restated, "leave or get arrested."

132.    The NYPD's actions were not only unconstitutional, they were dangerous. The NYPD's actions put hundreds of persons in jeopardy of injury from forced compression of people with

no avenue of escape, threat of injury from stampede, or being forced over the side of the bridge.

133.    When the police action commenced and rippled back through the crowd, a completely peaceful demonstration was suddenly gripped with chaos and pandemonium. It is extremely fortunate that there was not mass injury from the NYPD's dangerous actions.

134.    The plaintiff class was then subject to a mass false arrest by the NYPD.

135.    All of the officers or persons who participated in, or otherwise caused, the arrests of the plaintiffs or plaintiff class did so in disregard of their actual knowledge that the march had been permitted and led and escorted onto the roadway of the bridge.

136.    The plaintiff class was handcuffed, taken into custody, processed and released through the night into the early morning hours.

137.    At no time did the plaintiff class fail to obey a police order. At no time did the plaintiff class engage in disorderly conduct. At no time did the plaintiff class illegally block vehicular traffic on the Brooklyn Bridge, as the police had stopped vehicular traffic, opened up the roadway to pedestrian traffic, and themselves led and escorted the demonstration onto the roadway with police command officials at the lead. At no time did the plaintiff class engage in parading without a permit, as the march of several thousand was permitted to proceed and escorted by police throughout and there was never any notice to the class that such permission had been revoked.

138.    The NYPD then engaged in a mass falsification of arrest documents in order to subject members of the plaintiff class to the injury of criminal process.

139.    Each summons that was issued by a police officer to a class member includes the signature of a police officer who attests and signs beneath a line that states: "I personally

observed the commission of the offense charged above. False statements made herein are punishable as a Class A misdemeanor pursuant to Section 210.45 of the Penal Law. Affirmed under penalty of perjury."

140.    For example, many of the summonses including Summons 433455474-0 issued to plaintiff BECKER, attest under penalty of perjury that the police officer observed the arrestee "Fail to Obey Lawful Order by PO" or similar. Yet the police officer observed no such issuance of a police order, let alone a failure to obey by the arrestee. Many of the "arresting" officers were, in fact, assigned to arrestees at a precinct or location other than the Brooklyn Bridge and did not see the class member engaged in any conduct at all, let alone conduct alleged to constitute an offense.

141.    On information and belief, no officer has been disciplined for this practice or prosecuted for perjury, nor any supervisory officials who ordered or permitted the practice.

**Continued Adverse Effects and Future Recurrence**

142.    The continued existence of the trap-and-arrest policy, practice and custom imposes an objective and substantial chilling effect on the exercise of free speech and assembly rights.

143.    The continuation of the policies, practices and customs challenged herein places persons within the plaintiff class at risk for future false arrest should they continue to associate with protest and march activity in New York City. The risk presented by these practices is that a person - - no matter how law abiding his or her conduct - - is at risk for sudden and indiscriminate false arrest simply by virtue of being physically present near protest activity. The only way to be certain of avoiding false arrest is to avoid protest and march activities.

144.    Members of the plaintiff class, who continue to engage in protest activities in connection with the ongoing Occupy movement or other demonstrations, are at genuine and immediate

risk of being subject to false arrest in the future. The tactics complained of reflect a citywide practice, policy or custom of trapping and arresting groups of protesters. They are not the results of errant low level officers acting in violation of policy, but are the results of policy, practice or custom itself.

145.    On information and belief, some number of the persons arrested in the October 1, 2011 mass false arrest had previously been arrested in prior trap-and-arrest executions, including those that occurred on September 24, 2011. With the persistent occurrence of ongoing Occupy-related marches and activities, there is a real and immediate threat of recurrence that will affect members within the class.

146.    A person of reasonable firmness who wishes to engage in free speech and expressive activities is chilled in the exercise of those rights by this risk.

147.    Members of the plaintiff class have been chilled, and suffer ongoing, continued, and objectively reasonable chilling of their free speech activities and will continue to suffer unless and until the indiscriminate trap-and-arrest tactics are ceased voluntarily by consent decree or through injunctive relief.

148.    This chilling effect does not necessarily mean a complete termination of protest activities by those affected, but it does mean that ordinary people must curtail or limit their participation in First Amendment protected activities in order to avoid severe personal or professional or other repercussions/injuries from false arrest.

149.    Persons exercising their First Amendment rights in New York City by engaging in demonstration activities cannot, by conforming their conduct to the law, avoid arrest where the NYPD is allowed to conduct mass trap and detain arrests.

150.    Some members of the plaintiff class curtail their constitutionally protected free speech activities in order to avoid being subject again to false, sudden and indiscriminate arrest without any fair notice or warning.

151.    Plaintiffs allege such curtailment to constitute a continuing, adverse effect of the violations and tactics challenged herein.

152.    Plaintiff CRICKMORE, who is married with a three year old son, has curtailed and limited his free speech activities. CRICKMORE, who previously participated in such activities jointly with his wife, now switches off with her as to who may exercise their First Amendment rights, for fear that if they attend a demonstration together and are subject to false arrest, their small child will be without care. CRICKMORE also now generally refrains from taking his son with him to such activities.

153.    Plaintiff SOVA curtails his free speech activities. As a result of the ongoing, adverse effects of his arrest, and the threat of re-arrest, SOVA refrains from exercising his First Amendment rights through participation in protest activities during the work week for fear of being falsely arrested and missing work.

154.    Plaintiff PEREZ curtails her free speech activities. She still engages in First Amendment protected activities, but is less active now in marches and protests. She cannot afford to get arrested and miss work. Having accepted an Adjournment in Contemplation of Dismissal from this arrest, she believes that if she is wrongly arrested again, she will suffer severe consequences including the reinstatement of the false charges against her in the October 1, 2011 arrest.

155.    Plaintiff UMOH has, since the mass arrest, curtailed her participation in First Amendment protected protest activities due to fear of being arrested again while lawfully

engaged in such activity, without notice or warning by police and without any misconduct on her part.

156.    Other plaintiffs suffer adverse effects, or "organizing headwinds," reflected in the increased effort needed to overcome others' concerns that engaging in lawful peaceful protest activity places one at risk for arrest due to the indiscriminate arrest tactics described herein.

157.    Plaintiff GARCIA is a New York City school teacher who must, herself, report her arrest to administrators. GARCIA is a faculty advisor and facilitator for a student group at her high school and has taken responsibility with the school and parents for facilitating student participation in civic engagements, including participating in peace rallies and other expressive activities, such as those opposing budget cuts in education. GARCIA must expend additional efforts to overcome parents' and others' concerns that such activities places students at risk due to the indiscriminate and sudden nature of the challenged mass arrest tactics.

## UNCONSTITUTIONAL POLICIES AND PRACTICES

158.    The CITY OF NEW YORK and the NYPD maintain the policy, practice and/or custom of abusing state authority to disturb and disrupt targeted civil political assembly and mass demonstrations.

159.    The CITY OF NEW YORK and the NYPD maintain a policy, practice and/or custom of engaging in mass false arrests of protesters in the absence of probable cause.

160.    The CITY OF NEW YORK and the NYPD maintain a policy, practice and/or custom of engaging in mass group arrests without having probable cause to arrest the group as a group; and without having individualized or particularized probable cause to arrest each person within the mass group to be arrested.

28

161.    The CITY OF NEW YORK and the NYPD maintain a policy, practice and/or custom of

engaging in indiscriminate or dragnet-style arrests of protesters in the absence of

individualized probable cause, a practice typified by the NYPD's use of orange netting to

capture and arrest masses of people without regard to whether there exists probable cause to

arrest the individuals trapped in such sweeping seizures.

162.    The CITY OF NEW YORK and the NYPD maintain a policy, practice and/or custom of

engaging in mass group arrests of protesters without regard, or with disregard, as to whether

the target group contains persons for whom there is no probable cause to arrest.

163.    The CITY OF NEW YORK and the NYPD maintain a policy, practice and/or custom of

engaging in mass group arrests of protesters without giving the group fair notice, warnings or

order to disperse (or to comply with lawful police directives), and without giving a

meaningful and reasonable opportunity to comply.

164.    The CITY OF NEW YORK and the NYPD maintain a policy, practice and/or custom of

tolerating and failing to discipline unlawful police conduct against protesters including

specifically, false arrest.

165.    The CITY OF NEW YORK and the NYPD maintain a policy, practice and/or custom of

causing or justifying arrests for parading without a permit as a strict liability violation in the

absence of knowledge or *mens rea.* This policy caused or is used by the Defendants to justify

the arrest of the plaintiff class.

166.    The mass false arrest of the plaintiff class, was ordered or approved or ratified by

command staff and by NYPD policy makers with sufficient authority as to constitute agency

policy makers.

167.    The named defendants have been deliberately indifferent to the violation of plaintiffs'

constitutional rights.

168.    The named defendants have failed to adequately train or instruct the NYPD and its

officers so as to prevent the foreseeable violation of the clearly established rights of

protesters to be able to engage in peaceable assembly and free speech without being subject

to false arrest.

169.    Named defendants have failed to properly train officers regarding: the constitutional

requirements to give fair notice prior to the initiation of mass protest arrests, including in

particular when the target arrest group includes individuals for whom there is not probable

cause to arrest; the constitutional prohibitions against indiscriminate or dragnet-style arrests

in the absence of individualized probable cause when using police lines or netting to arrest

groups of protesters; the constitutional requirement of *mens rea* and knowledge or fair notice

before causing or justifying arrests for parading without a permit or disorderly conduct; the

constitutional requirements to provide fair notice where, having permitted a march to proceed

in the absence of an advance written permit, the police seek to impose restrictions on the

manner of conduct of the march or to revoke permission for the march; the constitutional

prohibition against arresting marchers absent fair notice for proceeding where police have

granted actual or apparent permission for a march to so proceed; the constitutional

requirements that fair notice be heard/received by all persons subject to potential arrest

regardless of the noise that demonstration groups may be making and/or the distance over

which the targeted group or march may be spread; and in the constitutional impropriety of

applying "disorder control" tactics against non-violent First Amendment protected assembly.

30

170.    The above-referenced policies, practices and/or customs, and also the failure to properly

train NYPD officers, constitute deliberate indifference on the part of the policymakers of the

CITY OF NEW YORK and of the NYPD, and by the named defendants, to the constitutional

rights of protesters as well as all those who would associate with such protesters.

## VIOLATIONS OF CLEARLY ESTABLISHED LAW

171.    The actions of the above-referenced defendants violated the following clearly established

and well settled federal constitutional rights:

    a.    Freedom from the unreasonable seizure of one's person;

    b.    Freedom from government disruption of, interference with, or retaliation for,

        engagement in free speech, assembly and association activities;

    c.    Freedom from deprivation of liberty absent, or in violation of, Due Process of law.

172.    Clearly established constitutional law was violated in this case where police permitted the

march to occur and failed to issue fair notice (audible or understandable to the group that was

subject to arrest) that permission had been revoked before the police engaged in arrests of the

plaintiff class.

173.    Clearly established law was violated where police permitted the march (and actually led

the march) to be present upon an ordinarily prohibited area and then, just minutes later,

arrested the marchers for having marched without permission or for being in an ordinarily

prohibited area.

174.    Even assuming *arguendo* that the bullhorn warning at the base of the bridge could

possibly have been heard by some set of persons, and further assuming *arguendo* that the

subsequent police permission to use the roadway was not superceding, clearly established

law was violated for the defendants to have imputed alleged culpability to the hundreds of

others who were marching in the same march and who were not a part of, nor privy to, that interaction.

175.    Clearly established law was violated where the plaintiff class of 700+ persons was arrested in the absence of an objectively reasonable probable cause determination particularized to the plaintiff class in its entirety or to each and every one of the individual class members.

176.    Clearly established law was violated where prior to the initiation of the arrest of the plaintiff class, fair notice was not issued including orders to comply or disperse issued in a manner reasonably likely to have reach all of the crowd despite any noise the demonstrators may have been making.

177.    Clearly established law was violated in that the plaintiff class was arrested without fair notice to the group as a whole, followed by time and opportunity to comply and a refusal to quit.

178.    NYPD Command Staff, identified and unidentified, participated in, caused, approved or ratified the arrest of the plaintiff class. This included through issuing or approving or ratifying the order to arrest the class. Additionally, individual supervisory officers had the duty to exercise appropriate command authority in their supervision of their subordinates and failed to do so, resulting in the unconstitutional deprivations complained of herein. Individual officers had the duty to intervene to prevent or halt unlawful and/or unconstitutional conduct complained of herein, including the mass false arrest of the class.

179.    No objectively reasonable officer or official could have participated or caused or approved or ratified the arrest of the plaintiff class with knowledge of these circumstances constituting violations of clearly established law.

## PRIOR EXECUTIONS OF UNCONSTITUTIONAL MASS PROTEST ARRESTS
## USING TACTICS CHALLENGED HEREIN

180.    The policies, practices and customs challenged herein are an outgrowth of the "Disorder
Control Guidelines" that were issued by Police Commissioner KELLY in the political
aftermath of the Crown Heights riots in 1991.

181.    In November, 1993, Police Commissioner Raymond W. Kelly released the NYPD's
Disorder Control Guidelines, which to this day constitute the "playbook" the NYPD has used
with little distinction between response to violent riots or peaceful free speech assembly.

182.    The use of orange mesh netting to trap and arrest protesters and engage in indiscriminate
mass arrests in the absence of individualized probable cause, was initiated as part of
Commissioner KELLY's NYPD Disorder Control Guidelines and practice.

*183*.    The City, under Commissioner KELLY and Mayor BLOOMBERG, has repeatedly
deployed police ostensibly engaged in "disorder control" to execute mass arrests of peaceful
protesters, indiscriminately, in the absence of individualized probable cause, and without fair
notice, warnings or orders to disperse to those subject to arrest.

184.    On April 7, 2003, the NYPD conducted a mass arrest of demonstrators who were
standing on a midtown sidewalk during a protest against the invasion of Iraq across the street
from the offices of the Carlyle Group. Without warning or notice or cause, police surrounded
the protesters and passers-by who happened to be walking on the same sidewalk, and without
giving a directive or providing opportunity to disperse or comply with any directive  the
police indiscriminately arrested everyone trapped within the police line cordon. Kunstler v.
City of New York, Civil Action No. 03-CV-02819-RWS, Southern District of New York (filed
February 11, 2004, terminated August 22, 2008).

33

185.    Multiple executions of the trap-and-arrest and indiscriminate tactics were perpetrated under

the auspices of defendants KELLY and BLOOMBERG in connection with the 2004 Republican

National Convention in New York City. According to the New York Times, 1,806 persons were

arrested in connection with RNC protests, and "[c]harges were ultimately dropped against 90

percent of them." Jim Dwyer, City Fights Efforts to Release 2004 Convention Arrest Records,

N.Y. Times, Dec. 13, 2006, at B2; Jim Dwyer, Videos Challenge Hundreds of Convention

Arrests, N.Y. Times, Apr. 12, 2005, at A1. These trap-and-arrests occurred at multiple times and

locations. MacNamara v. City of N.Y., 275 F.R.D. 125 (S.D.N.Y. 2011).

186.    In one RNC-related mass arrest, the Manhattan district attorney's office admitted it could not

prosecute cases against 227 protesters. In a statement to the Court, Assistant District Attorney

William Beesch admitted "The police likely created the impression among the participants that

the march [which lacked an advance written permit] had official sanction." Sabrina Tavernise,

Prosecutors Won't Pursue Case of 227 in Disputed Protest, N.Y. Times, Oct. 7, 2004, at B2.

187.    KELLY continued to ratify the arrest tactics notwithstanding.

188.    Front page news stories in national newspapers reported harsh criticism of the NYPD's

indiscriminate mass arrests of protest groups made without fair notice or warnings and in the

absence of individualized probable cause.

189.    BLOOMBERG has approved or ratified, or in the alternate has knowingly tolerated, the

indiscriminate mass false arrest of groups of protesters in the absence of individualized

probable cause.

190.    On his weekly WABC news show, BLOOMBERG justified indiscriminate arrests and

stated, "If you go to where people are protesting and don't want to be part of the protest,

you're always going to run the risk that maybe you'll get tied up with it." Michael Powell

and Michelle Garcia, <u>Arrests at GOP Convention Are Criticized: Many in N.Y. Released Without Facing Charges</u>, The Wash. Post, Sept. 20, 2004, at A1.

191.    Commissioner KELLY has explicitly ratified and defended the mass false arrests of the NYPD, even in response to a Civilian Complaint Review Board letter which sharply criticized police conduct in connection with two specific RNC mass arrests and which specifically recommended additional training for officers. KELLY ratified the arrests stating, "[T]he implication that the N.Y.P.D. failed during the R.N.C. turns truth on its head." KELLY stated "The policing of the R.N.C. was one of the Police Department's finest hours." According to the <u>New York Times</u>, referring to the RNC protest arrests, KELLY stated that the police are not obligated to give warnings before arrests. <u>See</u> Al Baker, <u>2 Top Officers Are Criticized for '04 Arrests</u>, N.Y. Times, May 10, 2006, at B5.

192.    One week prior to the October 1, 2011 mass arrest, on September 24, 2011, the NYPD implemented the indiscriminate trap-and-arrest tactic in connection with an Occupy-related march to Union Square.

193.    At the intersection of 12th & University Place, there was an incident involving police throwing protesters to the ground, striking and arresting multiple individuals. The NYPD used orange netting to trap indiscriminately persons who were in the vicinity, specifically including those who were lawfully and peaceably on the sidewalk. Without warning or notice, the police surrounded those on the south sidewalk and arrested the entire group of 30 – 40 persons in the absence of probable cause.

194.    On information and belief, additional incidents of prior uses of the challenged tactics in the context of mass protest arrests may exist and will be determined within discovery.

195.    Defendants KELLY and BLOOMBERG and the CITY OF NEW YORK have adopted

the trap-and-arrest tactic and other or related policies, practices and customs challenged

herein in order to disrupt targeted protest actions, to sweep the sidewalks and public ways of

targeted protest actions, to demoralize and chill targeted protests and free speech activities.

196.    In the alternative, defendants KELLY and BLOOMBERG and the CITY OF NEW

YORK knew or should have know of the unconstitutional policies, practices and customs

challenged herein and have failed and refused to take corrective action, thereby perpetrating

their continued existence and mass violation of constitutional rights.

197.    Defendants KELLY, BLOOMBERG and the CITY OF NEW YORK have known, or

should have known, of these unconstitutional policies, practices or customs as a consequence

of complaints (including but not limited to multiple civil lawsuits) asserting constitutional

violations in the context of protest activity; from the occurrence of over 1,800 incidents of

arrests in connection with the 2004 RNC alone, over 90% of which resulted in dismissals or

acquittals; from the millions of dollars in compensation that the City has paid in resolution of

such complaints that have been resolved by settlement; from the ordinary after-action review

and reporting of police conduct after mass demonstrations; from the major national news

media articles or stories that have reported on the indiscriminate mass arrest tactics of the

NYPD; and from other sources of information and communication.

198.    Defendant KELLY is responsible for the NYPD's "disorder control" practices, including

those challenged herein.

199.    On information and belief, KELLY tacitly or explicitly participated in, approved and/or

ratified the conduct of the October 1, 2011 mass arrest.

36

200.    In the alternate, KELLY was grossly negligent in monitoring the conduct of subordinates

in the mass arrest.

201.    On information and belief, KELLY was in communication with subordinates regarding

the march as it progressed, including the police response.

202.    KELLY possessed the authority to, but did not cease the mass arrests or cause the release

of arrestees.

203.    On information and belief, Defendant BLOOMBERG considers the conduct of the

NYPD in response to First Amendment protected assemblies to be a fundamental

characteristic of his administration, and he approves of the use of the police to engage in the

mass arrests as described and challenged herein.

204.    BLOOMBERG actively participates in the management of the NYPD to ensure it

functions in the manner in which he intends. "I have my own army in the NYPD, which is

the seventh largest army in the world," stated BLOOMBERG on November 29, 2011.

205.    With respect to the Saturday, October 1, 2011 mass arrest, on the immediately following

Sunday, Mayor BLOOMBERG ratified the mass arrest of the plaintiff class stating, "The

police did exactly what they were supposed to do." Mosi Secret, Police, Too, Release Videos

of Brooklyn Bridge Arrests, N.Y. Times, Oct. 3, 2011, at A22.

206.    On information and belief, BLOOMBERG issued his October 2, 2011 ratification of the

plaintiffs' mass arrest only after he had satisfied himself that he had reviewed and possessed

sufficient information for him to issue such an after-the-fact ratification on an informed and

knowledgeable basis.

207.    On December 6, 2011, Congressman Jerrold Nadler, the Ranking Member of the House

Judiciary Committee's Subcommittee on the Constitution, as well as the representative of

Lower Manhattan, sent a letter to Attorney General Eric Holder specifically citing the

Brooklyn Bridge mass arrest among three incidents that "are worthy of investigation." Rep.

Nadler requested the Department of Justice investigate whether the "unlawful targeting of

individuals based in their participation in constitutionally protected activities, occurred."

208.    Nadler wrote "many of the marchers allege that they were under the impression that the

march was a lawful one, that they observed officers directing them onto the bridge, and that

they never heard warnings that they would be subject to arrest." Nadler requested:

> "I urge you to determine whether these actions constituted a deprivation of rights
> under color of law in violation of 18 U.S.C. §§241 and 242, **whether the NYPD
> engaged in a pattern or practice of conduct that deprived individuals of
> rights protected by the Constitution** or laws of the United States in violation of
> 42 U.S.C. § 14141, and what can be done to prevent similar actions that violate
> people's civil and constitutional rights under color of law in these and similar
> situations."

Dec. 6, 2011 Letter from Rep. Nadler to Attorney General Holder (emphasis added).

209.    KELLY and BLOOMBERG rejected the call for such investigation, again approving and

ratifying the conduct at bar and rejecting corrective action or even outside review.

210.    Mayor BLOOMBERG called the request for investigation "ridiculous."

211.    On December 7, 2011, NYPD spokesperson Paul Browne, presumably with the approval

of Commissioner KELLY, ratified and defended the Brooklyn Bridge arrests as warranted.

212.    As a direct and proximate result of the acts or omissions of the defendants identified in

this complaint and the other unidentified persons acting jointly, each of the plaintiffs has

suffered monetary and non-monetary harm, including deprivation of constitutional rights

under the First and Fourth Amendments to the U.S. Constitution and the Due Process Clause,

loss of liberty and related suffering and harm, and violation of state and common law rights

to be free of unlawful arrest and false imprisonment.

**NOTICE OF CLAIM PURSUANT TO § 50-e, N.Y. GENERAL MUNICIPAL LAW**

213.   The public interest exception applies in the circumstances of this case to waive or except

the ordinary requirement of the filing of a Notice of Claim under N.Y. General Municipal

Law, § 50-e. See Pustilnik v. Hynes, 2000 U.S. Dist. LEXIS 8718, at *21 (E.D.N.Y. June 27,

2000); Mills v. County of Monroe, 59 N.Y.2d 307, 311 (1983).

214.   Under the circumstances of this large scale mass protest arrest, the municipality possesses

actual knowledge and notice of the underlying events and likely claims for false arrest

regardless of filing or non-filing of a notice of claim.

215.   Nevertheless, on October 28, 2011 a Notice of Claim was filed "in the matter of the

claims of Karina Garcia, Marcel Cartier, Yari Osorio, Benjamin Becker, [and] Cassandra

Regan [a]s class representatives, on behalf of themselves and others similarly situated,

including [a]ll persons who were arrested on or at the Brooklyn Bridge in the mass arrest

conducted on October 1, 2011."

216.   At least 30 days have elapsed since the service of such notice and the adjustment or

payment thereof has been neglected or refused.

### CLAIMS

### COUNT I
### False Arrests On or At the Brooklyn Bridge
### (First Amendment; Fourth Amendment; Fourteenth Amendment to the U.S.
### Constitution; Due Process Clause; 42 U.S.C. §1983)

217.   Paragraphs 1 through 216 are incorporated by reference as if set forth herein.

218.   The defendants' actions (including the CITY OF NEW YORK, KELLY, BLOOMBERG

and the JANE and JOHN DOE DEFENDANTS) in participating in, executing, causing to be

executed, failing to intervene to cause the cessation of, approving or ratifying the arrest of the

39

plaintiff class on October 1, 2011 on or at the Brooklyn Bridge violated the rights of

plaintiffs pursuant to the First, Fourth and Fourteenth Amendments to, and the Due Process

Clause of, the U.S. Constitution. <u>See</u> <u>also</u> 42 U.S.C. § 1983.

219.    Defendants CITY OF NEW YORK, KELLY and BLOOMBERG have adopted

municipal policies, practices and customs that have caused the violations complained of

herein; and in the alternate have actual or constructive notice of a pattern of constitutional

violations described herein and have failed to take action, thereby allowing the continuation

of such a policy or custom, and causing the harms complained of herein.

220.    The acts and omissions of the CITY OF NEW YORK, KELLY, BLOOMBERG, and

DOE defendants constitute deliberate indifference to the constitutional rights of the plaintiff

class.

221.    Defendants CITY OF NEW YORK, KELLY and BLOOMBERG have tolerated and

failed to discipline and/or train officers regarding unlawful conduct towards protesters,

including specifically false arrest, thereby causing the violations complained of herein.

222.    Defendants CITY OF NEW YORK, KELLY and BLOOMBERG and supervisory

officers identified as DOES have been grossly negligent in the supervision of subordinates,

thereby causing the violations complained of herein.

223.    As a direct and proximate result of said acts or omissions, the plaintiff class and

individual members of the plaintiff class have suffered and will continue to suffer ongoing

adverse effects and injury, including the real and immediate risk future false arrest of class

members who have the intention of engaging in or being in proximity to free speech and

protest activities in New York City.

**COUNT II**

**False Arrests On or At the Brooklyn Bridge**
**(New York State and Common Law Claims; False Arrest; Negligence and Gross**
**Negligence; Negligent Supervision)**

224.    Paragraphs 1 through 216 are incorporated by reference as if set forth herein.

225.    The defendants' actions (including the CITY OF NEW YORK, KELLY, BLOOMBERG

and the JANE and JOHN DOE DEFENDANTS) in participating in, executing, causing to be

executed, failing to intervene to cause the cessation of, approving or ratifying the arrest of the

plaintiff class on October 1, 2011 on or at the Brooklyn Bridge violated the rights of

plaintiffs pursuant to the provisions of the New York State Constitution corresponding to the

violations of the U.S. Constitution in Count I.

226.    The defendants' actions (including the CITY OF NEW YORK, KELLY, BLOOMBERG

and the JANE and JOHN DOE DEFENDANTS) in participating in, executing, causing to be

executed, failing to intervene to cause the cessation of, approving or ratifying the arrest of the

plaintiff class on October 1, 2011 on or at the Brooklyn Bridge constitute false arrest under

New York State law and common law.

227.    Defendants CITY OF NEW YORK, KELLY and BLOOMBERG and officers identified

as DOES have been negligent and grossly negligent, thereby causing the violations

complained of herein.

228.    As a direct and proximate result of said acts or omissions, the plaintiff class and

individual members of the plaintiff class have suffered and will continue to suffer ongoing

adverse effects and injury, including the real and immediate risk future false arrest of class

members who have the intention of engaging in or being in proximity to free speech and

protest activities in New York City.

41

## PRAYER FOR RELIEF

229.    WHEREFORE, Plaintiffs respectfully request that this Honorable Court grant the

following relief:

    a.   Entry of a declaratory judgment that the disruption and preventive arrest tactics of the

        defendants constitute violations of the First and Fourth Amendments;

    b.   Entry of a permanent injunction to enjoin and prohibit the CITY OF NEW YORK

        from executing the unconstitutional disruption and false arrest tactics complained of

        herein, including but not limited to the trap-and-arrest tactic whereby without fair

        notice the NYPD engages in the mass false arrest of persons engaged in lawful free

        speech activity and peaceable assembly;

    c.   Entry of a permanent injunction to enjoin and prohibit the CITY OF NEW YORK

        from using orange netting to indiscriminately trap and arrest persons in the absence of

        the existence of particularized probable cause exists to seize and arrest each and every

        individual to be trapped and arrested by the netting;

    d.   Entry of a declaratory judgment that N.Y. City Adm. Code § 10-110(c) parading

        without a permit code provision is unconstitutional, facially or as applied to the extent

        it is applied as a strict liability offense, and entry of a permanent injunction

        prohibiting enforcement as a strict liability offense (i.e., enforcement in the absence

        of fair notice or warnings/orders to those subject to potential arrest);

    e.   Entry of a permanent injunction requiring defendants to seal and destroy the records

        derived from this arrest, including all photographs, fingerprints and other

        identification or descriptive information;

f.  Entry of an order that disclosure be made in writing to plaintiffs and the Court as to all entities and agencies to which such material, and other intelligence information derived from or relating to the underlying events, has been disseminated and by whom gathered; and that all records gathered and disseminated be collected and sealed, including all copies of such disseminated records that may have been subject to further dissemination by others;

g.  Entry of an order declaring the arrests to be null and void, and authorizing each individual class member to deny that such arrest ever occurred in response to any inquiry, such as employment or educational or any other nature of inquiry;

h.  Compensatory damages against the defendants for violations of federal rights pursuant to 42 U.S.C. § 1983 in an amount appropriate to the proof adduced at trial;

i.  Compensatory damages against the defendants under New York and common law, including against the CITY OF NEW YORK under *respondeat superior*, in an amount appropriate to the proof adduced at trial;

j.  Punitive damages against MICHAEL R. BLOOMBERG, and as against other defendants sued in their individual capacities, for causing, approving and/or ratifying the arrest of the plaintiff class and for the consequential loss of freedom of expression and constitutionally protected rights of peaceable assembly;

k.  An award of plaintiffs' reasonable attorneys' fees and costs and expenses pursuant to 42 U.S.C. §1988 and any other applicable statute or rule of law; and

l.  Such other and further relief, including all appropriate equitable relief, as to the Court may seem just and proper.

**PLAINTIFFS DEMAND A TRIAL BY JURY OF ALL ISSUES SO TRIABLE**

Dated: December 12, 2011                Respectfully submitted,


Mara Verheyden-Hilliard (MV7011)
PARTNERSHIP FOR CIVIL JUSTICE FUND
617 Florida Ave. N.W.
Washington, D.C. 20001
T. 202.232.1180;   F. 202-747-7747
Email: mvh@justiceonline.org


Carl Messineo (CM4500)
PARTNERSHIP FOR CIVIL JUSTICE FUND
617 Florida Ave. N.W.
Washington, D.C. 20001
T. 202.232.1180;   F. 202-747-7747
Email: cm@justiceonline.org

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of December 2011 I caused to be served via overnight delivery a copy of the foregoing Second Amended Complaint along with a DVD containing attachments to defendants' counsel Arthur Larkin, and a courtesy copy consisting of the same to the chambers of the Honorable Jed S. Rakoff.


Arthur G. Larkin, Esq.
Senior Counsel
New York City Law Department
100 Church Street, Room 3-177
New York, NY 10007

Hon. Jed S. Rakoff
Room 1340
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007-1312


December 12, 2011                    Respectfully submitted,


MaraVerheyden-Hilliard (MV7011)
PARTNERSHIP FOR CIVIL JUSTICE FUND
617 Florida Ave. N.W.
Washington, D.C. 20001
T. 202.232.1180;  F. 202-747-7747
Email: mvh@justiceonline.org