UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ X
KARINA GARCIA, et al.,

                                                                11-CV-6957 (JSR)

                                        Plaintiffs,

                                                                **ECF Case**

                v.


MICHAEL R. BLOOMBERG, et al.,

                                        Defendants.
------------------------------------------------------------------------ X




## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR ANSWER AND OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT, WITH PREJUDICE

Carl Messineo
Mara Verheyden-Hilliard
PARTNERSHIP FOR CIVIL JUSTICE FUND
617 Florida Ave. N.W.
Washington, D.C. 20001
T. 202.232.1180;   F. 202-747-7747
Email: cm@justiceonline.org
Email: mvh@justiceonline.org

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... i

PRELIMINARY STATEMENT ................................................................................... IV

ARGUMENT .................................................................................................................1

I.    Governing Standards............................................................................................ 1

II.   Plaintiffs State Fourth Amendment Claims for False Arrest .......................... 2

    A.   It Violates Clearly Established Law Requiring Particularized Probable Cause to Arrest Over 700+ People Because One or a Handful of Persons Allegedly Heard and Disregarded Specific Warnings Not to Enter the Roadway of the Bridge............................................................................................................ 2

    B.   Defendants Offer a Clearly Unconstitutional Theory of Criminalization of Dissent or Imputation of Alleged Guilt To Others Based on Political Association....................................................................................................... 5

    C.   It Violates Clearly Established Law for Police to Have Permitted Marchers to Proceed Onto the Roadway of the Bridge and, Without Notice, to Mass Arrest Marchers for Engaging in the Very Conduct Police Permitted .................. 7

        1. Parading Without a Permit.......................................................................8

           a. Police Did Not Arrest Anyone for Parading Without a Permit; And Therefore No Official Or Doe Defendant Can Claim Qualified Immunity for a Course of Action Not Taken ...........................................9

           b. Where Police Permitted Several Thousand Persons to March, Absent Fair Notice and Warnings Issued to the Marchers as a Group, Police Lacked Probable Cause to Arrest for Parading Without a Permit...........9

           c. Devenpeck Provides No Defense to False Arrest Claims Where the Parading Without a Permit Statute is Unconstitutional.........................11

        2. Defendants Lacked Probable Cause to Arrest for Disorderly Conduct - Obstructing Vehicular Traffic ................................................................ 14

D.  It Violates Clearly Established Law to Conduct a Mass Arrest of 700+ Persons Where the Target Arrest Group Contained Persons For Whom There Was No Probable Cause to Arrest, Including Persons Who Had Originally Proceeded on the Pedestrian Walkway and Moved to the Roadway Only After Police Conveyed Permission for the Roadway to be Used ...................................................................... 15

III.  There is No Basis to Dismiss the First Amendment Claims......................................... 16

IV.  The Due Process Claim Should Not Be Dismissed ...................................................... 16

V.  There is No Basis to Dismiss the State Law Claims..................................................... 17

  A.  The Notice of Claim Requirement Does Not Apply to Civil Rights Class Actions ............................................................................................................... 17

  B.  Plaintiffs Nevertheless Properly Filed a Notice of Claim...................................... 17

VI.  Plaintiffs' Monell Claims for Municipal Liability Should Not be Dismissed .............. 18

  A.  Plaintiffs Have Adequately Pled Plausible and Non-Speculative Bases for Municipal Liability .............................................................................................. 18

  B.  Actions by Commissioner Kelly .......................................................................... 25

VII.  The Failure to Train Claims Are Adequately and Specifically Pled ............................ 25

CONCLUSION............................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

Allen v. City of N.Y.,
    2007 U.S. Dis. LEXIS 15 (S.D.N.Y. Jan. 3, 2007) ...................................................10

Am.-Arab Anti-Discrimination Comm. v. City of Dearborn,
    418 F.3d 600 (6th Cir. 2005) ..................................................................12, 13, 23

Amnesty Am. v. Town of W. Hartford,
    361 F.3d 113 (2d Cir. 2004) ...............................................................................19

Ashcroft v. Iqbal,
    566 U.S. 662 S. Ct. 1937 (2009)............................................................................2

Barham v. Ramsey,
    434 F.3d 565 (D.C. Cir. 2006)..............................................................3, 4, 5, 7, 16

Bd. of Cnty. Comm'rs v. Brown,
    520 U.S. 397 (1997)...........................................................................................18

Bell Atl. Corp. v. Twombly,
    550 U.S. 544 (2007)........................................................................................1, 19

Buck v. City of Albuquerque,
    549 F.3d 1269 (10th Cir. 2008) .......................................................................8, 11

Carr v. District of Columbia,
    587 F.3d 401 (D.C. Cir. 2009).......................................................................6, 7, 12

Cash v. County of Erie,
    654 F.3d 324 (2d Cir. 2011) ...............................................................................19

Chambers v. Time Warner, Inc.,
    282 F.3d 147 (2d Cir. 2002) .................................................................................2

City of Canton v. Harris,
    489 U.S. 378 (1989)...........................................................................................19

City of Chi. v. Morales,
    527 U.S. 41 (1999)........................................................................................10, 14

Colon v. Coughlin,
    58 F.3d 865 (2d Cir. 1995) .............................................................................21, 25

Connick v. Thompson,
    131 S. Ct. 1350 (2011).....................................................................................18, 19

Cox v. Louisiana,
    379 U.S. 559 (1965)........................................................................8, 11, 14, 16

Davidson v. Bronx Mun. Hosp.,
    64 N.Y.2d 59 (1984) ..........................................................................................18

**Cases** **Page**

Dellums v. Powell,
566 F.2d 167 (D.C. Cir. 1977)................................................................3, 5, 8, 11, 16

Devenpeck v. Alford,
543 U.S. 146 (2004)........................................................................................9, 12

Ehrlich v. Town of Glaston,
348 F.3d 48 (2d Cir. 2003) ....................................................................................9

Fiacco v. City of Rensselaer,
783 F.2d 319 (2d Cir. 1986) ................................................................................23

Fogarty v. Gallegos,
523 F.3d 1147 (10th Cir. 2008) ..............................................................................4

Jeffes v. Barnes,
208 F.3d 49 (2d Cir. 2000) ..................................................................................23

Jones v. McMahon,
2005 U.S. Dist. LEXIS 42291 (N.D.N.Y. Mar. 28, 2005) .........................................4

Larez v. Los Angeles,
946 F.2d 630 (9th Cir. 1991) ................................................................................24

Lennon v. Miller,
66 F.3d 416 (2d Cir. 1995) ....................................................................................9

Liberty Envtl. Svs. v. County of Westchester,
2000 U.S. Dist. LEXIS 13 (S.D.N.Y. Sept. 15, 2000)............................................24

MacNamara v. City of N.Y.,
275 F.R.D. 125 (S.D.N.Y. 2011) ..........................................................................20

Maryland v. Pringle,
540 U.S. 366 (2003)..............................................................................................4

Mills v. County of Monroe,
59 N.Y.2d 307 (1983)..........................................................................................17

NAACP v. Claiborne Hardware,
458 U.S. 886 (1982)..............................................................................................6

Okla. City v. Tuttle,
471 U.S. 808 (1985) ............................................................................................21

Oouch v. U.S. Dep't of Homeland Sec.,
633 F.3d 119 (2d Cir. 2011) ................................................................................12

Papineau v. Parmley,
465 F.3d 46 (2d Cir. 2006) .................................................4, 5, 6, 8, 10, 11, 14, 16

People v. Barrett,
2006 NY Slip Op 26363, 13 Misc. 3d 929, (Crim. Ct. N.Y. County 2006) ..............13

**Cases**                                                                      **Page**

People v. Bezjak,
  2006 NY Slip Op 26006, 11 Misc. 3d 424, (Crim. Ct. N.Y. County 2006) ........................13, 14

People v. Namer,
  2006 NY Slip Op 26001, 11 Misc. 3d 409, (Crim. Ct. N.Y. County 2006) ..............................13

Pustilnik v. Hynes,
  2000 U.S. Dist. LEXIS 8718, at (E.D.N.Y. June 27, 2000) .......................................................17

Reynolds v. Giuliani,
  506 F.3d 183 (2d Cir. 2007) .....................................................................................................20

Roe v. City of Waterbury,
  542 F.3d 31 (2d Cir. 2008) .......................................................................................................18

Smith v. California,
  361 U.S. 147 (1959)..................................................................................................................12

Sorlucco v. N.Y. City Police Dep't,
  971 F.2d 864 (2d Cir. 1992) .....................................................................................................22

St. Louis v. Praprotnik,
  485 U.S. 112 (1988)..................................................................................................................22

Staples v. United States,
  511 U.S. 600 (1994)..................................................................................................................12

Starr v. Sony BMG Music Entm't,
  592 F.3d 314 (2d Cir. 2011) ....................................................................................................1,2

Thomas & Agnes Carvel Found. v. Carvel,
  736 F. Supp. 2d 730 (S.D.N.Y. 2010) .......................................................................................2

Union Free Sch. Dist. No. 6 of Towns of Islip & Smithtown v. N.Y. State Human Rights Appeal
  Bd.,
  35 N.Y.2d 371 (1974)...............................................................................................................17

United States v. Oakford Corp.,
  79 F. Supp. 2d 357 (S.D.N.Y. 1999) ........................................................................................10

United States v. Sheehan,
  512 F.3d 621 (D.C. Cir. 2008)..................................................................................................12

Vann v. City of N.Y.,
  72 F.3d 1040 (2d Cir. 1995) .....................................................................................................22

Vodak v. City of Chi.,
  639 F.3d 738 (7th Cir. 2011) .............................................................................................3, 8, 11

Wash. Mobilization v. Cullinane,
  566 F.2d 107 (1977) ...................................................................................................................3

Wieman v. Updegraff,
  344 U.S. 183 (1952)..................................................................................................................12

**Cases**                                                                        **Page**

Williams v. Nassau County Med. Ctr.,
 6 N.Y.3d 531 (2006)...................................................................................................17

Ybarra v. Illinois,
 444 U.S. 85 (1979)..................................................................................................4, 5


**Statutes**


42 U.S.C. §1983..............................................................................................................17

N.Y. City Adm. Code §10-100........................................................................................13

N.Y. City Adm. Code § 10-110.......................................................................................13

N.Y. City Adm. Code § 10-110(a) ..................................................................................12

N.Y. City Adm. Code § 10-110(c) ..................................................................................12

N.Y. General Municipal Law, § 50-k(6) .........................................................................17

Penal Law §15.1(2)..........................................................................................................13

**Preliminary Statement**

On October 1, 2011, police permitted and escorted a march throughout downtown Manhattan, guiding several thousand marchers who were spirited and strong in dissent as well as compliant with police directives.

At the Brooklyn Bridge, police command staff led marchers upon the vehicular roadway and halfway across the bridge. Having conveyed actual and/or apparent permission for marchers to proceed, and indeed having led and escorted marchers across, the police, in a massive violation of civil rights, then stopped the procession and arrested hundreds for having done precisely what police had conveyed permission to do.

This is not a case of mass non-compliance. This is a case of trap-and-arrest, a mass civil rights violation that is a recent manifestation of a policy, practice and/or custom that has been used by the defendants to suddenly and indiscriminately trap and arrest persons associated with targeted protests or groups, in the absence of fair notice or warnings or orders calculated to reach those subject to arrest, and without regard to the existence of probable cause to arrest.

Each of the arguments presented by the defendants for dismissal is without merit.

**Argument**

**I.     Governing Standards**

While a complaint "does not need detailed factual allegations" it must allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "A formulaic recitation of the elements of a cause of action will not do." Id.; Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2011). "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," dismissal is appropriate. Id. at 321 (citing Ashcroft v. Iqbal, 566 U.S. 662, 129 S. Ct. 1937, 1950); See Thomas & Agnes Carvel Found. v. Carvel, 736 F. Supp. 2d 730, 756 (S.D.N.Y. 2010).

In review of a motion to dismiss pursuant to Rule 12(b)(6), the District Court "constru[es] the complaint liberally, accepting all factual allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor." Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002); See also Iqbal, 566 U.S. 662, 129 S. Ct. 1937, 1949 (2009) ("a court must accept as true all of the allegations contained in a complaint").

II.     **Plaintiffs State Fourth Amendment Claims for False Arrest**

Dismissal is inappropriate. Plaintiffs have more than adequately established the "plausibility" of claims that the mass arrest was in violation of the Fourth Amendment.

> **A. It Violates Clearly Established Law Requiring Particularized Probable Cause to Arrest Over 700+ People Because One or a Handful of Persons Allegedly Heard and Disregarded Specific Warnings Not to Enter the Roadway of the Bridge**

Defendants open their argument by contending that "They [the 700+ persons in the putative class] were arrested and charged with Disorderly Conduct because they disregarded specific warnings not to enter the roadway of the bridge." Memorandum in Support of Defendants' Motion to Dismiss the Second Amended Complaint (hereinafter "MTD").

Yet, "they," the putative class, did not disregard specific warnings not to enter the roadway of the bridge. The referenced warnings were not issued to the putative class. One single officer issued warnings that could not even be heard mere feet away. Second Amended Complaint ("SAC") Exh. F.

Those directives were inaudible to the march as a whole and could have been heard, if at all, by only a handful of people. SAC ¶¶97 - 103.  Everyone else heard nothing of such orders and simply knew that police were leading and escorting the march across the bridge. No named plaintiff heard such orders. SAC ¶¶41, 116-124.

2

Referring generically to all marchers, or using pronouns such as "they" without particularity, is an attempt to mask one of the many fundamental constitutional defects of this mass arrest: a complete absence of particularized or individualized probable cause.

Video Exhibit F shows that the directives from this one officer are inaudible mere feet away, and shows officers and command staff turning and leading demonstrators onto the bridge roadway and across the bridge. SAC ¶¶8, 105, Exh. F.

"[T]he 'fair notice' required [by the Constitution] is notice reasonably likely to have reached all of the crowd despite any noise the demonstrators may have been making." Dellums v. Powell, 566 F.2d 167, 181 n.31 (D.C. Cir. 1977) (citing Wash. Mobilization v. Cullinane, 566 F.2d 107 (1977)); See also Barham v. Ramsey, 434 F.3d 565, 576 (D.C. Cir. 2006) (quoting Dellums, 566 F.2d at 181 n.31).

The case at bar is similar in salient respects to Vodak v. City of Chicago, in which marchers lacking an advanced written permit were permitted to march. Orders to disperse or to restrict marching to certain routes were allegedly issued using multiple bullhorns at multiple locations but were not heard by all of those subject to arrest. Reversing a grant of summary judgment to defendants, the Seventh Circuit stressed the need for fair notice to be heard by individual marchers.

> There would have to be evidence that the police reasonably believed that the protesters who were arrested, or at least most of them, had heard the orders. For this could not be assumed. Bullhorns will not carry from Michigan Avenue to the inner drive. . . Maybe the marchers . . . should have guessed that it was a forbidden route as well, and no doubt some did, but others may simply have been following the crowd, thinking that . . . it was a proper route for the march. . .

Vodak v. City of Chi., 639 F.3d 738, 745 (7th Cir. 2011).

Defendants suggest only a few persons in the front of the sub-group of marchers could hear the directives. See MTD at 18 ("marchers in the front undisputedly heard the warnings").

Defendants also argue that at the time officers had cause "to arrest [unspecified] members of the crowd for violating the Disorderly Conduct statute" for failing to leave the roadway in response to those directives. MTD at 15. This formulation, however, evades the issue. The police did not at that time arrest the one or handful of persons who they assert heard such orders. The police arrested over seven hundred *other* persons who had not heard such orders. And they did so after turning and leading them onto the roadway of the Brooklyn Bridge.

Qualified immunity does not protect any person from participation in a mass arrest so devoid of particularized probable cause.

Under clearly established precedent, probable cause to arrest requires an individualized determination. Ybarra v. Illinois, 444 U.S. 85, 91 (1979); See also Jones v. McMahon, 2005 U.S. Dist. LEXIS 42291 (N.D.N.Y. Mar. 28, 2005), aff'd in part, rev'd in part sub nom., Papineau v. Parmley, 465 F.3d 46 (2d Cir. 2006) (quoting Maryland v. Pringle, 540 U.S. 366, 371 (2003)) ("'belief of guilt must be particularized with respect to the person' arrested"); See also Fogarty v. Gallegos, 523 F.3d 1147, 1158 (10th Cir. 2008); Barham, 434 F.3d 565 (quoting Maryland v. Pringle, 540 U.S. 366, 370-71 (2003)).

Every individual participant in a demonstration is vested with the constitutional right to be protected against arrest in the absence of probable cause. U.S. Const. amend. IV.

> Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another . . . .

Ybarra, 444 U.S. at 91.

Individualized particularity mandates police have an objectively reasonable basis to believe there is probable cause to arrest each person within the target group, which in this case exceeded 700 persons. Failing that, arrest of the target group may only be upon fair notice to the

group as a whole, followed by time and opportunity to comply and refusal to quit. See Papineau v. Parmley, 465 F.3d 46, 60 (2d Cir. 2006) (quoting Dellums, 566 F.2d at 181 n.31) ("Where '[t]he record . . . indicates that not all of the arrestees were violent or obstructive or noisy . . . [and] only a small minority of the demonstrators were involved in any mischief,' notice and time to comply with a dispersal order is required."); Dellums, 566 F.2d at 181 nn.30-31 (the arrest of 1,200 protesters as a group requires objectively reasonable basis to believe probable cause exists to arrest each of the 1,200 potential arrestees; or else mass arrest could only be upon fair notice to the group, opportunity to comply and refusal to quit); See also Barham, 434 F.3d at 568 (citing Ybarra v. Illinois, 444 U.S. 85 (1979)) (mass arrest of 386 persons required Chief to have "had particularized probable cause to arrest each of the 386 people caught in the police sweep" absent fair notice and refusal to quit).

### B. Defendants Offer a Clearly Unconstitutional Theory of Criminalization of Dissent or Imputation of Alleged Guilt To Others Based on Political Association

The heart of defendants' theory of probable cause can be found on page 17 of their Motion to Dismiss. Defendants offer the remarkable argument that a few protestors at the front of a sub-group heard and allegedly defied orders to leave the roadway, therefore giving rise to probable cause to arrest the entirety of the putative class on the basis that the marchers were politically associated or "cohesive."

Defendants offer a theory of criminalization of dissent, that if allegedly a few protestors defied orders then potentially hundreds of other associated protesters can be arrested.

It is no wonder that a pattern and practice of mass dragnet-style and indiscriminate false arrests of protesters has been sustained in New York City when the City, the NYPD, its Mayor and Police Commissioner are operating under this reasoning.

Such alleged[1] guilt by political association has long been rejected under clearly established law. Papineau v. Parmley, 465 F.3d 46, 57 (2d Cir. 2006) (quoting NAACP v. Claiborne Hardware, 458 U.S. 886, 908 (1982)) ("[A]lthough defendants make much of the fact that some demonstrators had allegedly violated the law, transforming the peaceful demonstration into a potentially disruptive one, the Supreme Court has expressly held that '[t]he right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected.'")

Defendants misapply Carr v. District of Columbia, 587 F.3d 401 (D.C. Cir. 2009) There is nothing in Carr to support a claim that police can impute to others culpability, or knowledge of warnings, based on political or group cohesiveness.

The D.C. Circuit stressed that the Carr case involved rioting,[2] id. at 406, observed that the number of arrestees was relatively small, between 65 to 75, id., and that an undercover police officer attested to repeated acts of violence and property damage. He testified he personally observed that each individual, "everyone in the group," engaged in such conduct either by

---

[1]    Plaintiffs do not take the position that there was probable cause to arrest the one or handful of persons who did not respond to these directives, as the directives to leave the roadway were immediately superseded by the fact that police thereupon turned and led and escorted persons onto the roadway of the bridge.

[2]    The riot began as a march "at 11:30 at night and proceeded through a residential neighborhood; that the parade's participants were carrying torches, setting fires and placing obstacles in the street." Id. at 411 "[A] number of marchers used their flaming torches to set fire to debris in trash containers . . . and the undercover officer witnessed marchers spray painting buildings and cars." Id. at 403. Members of the march used missiles to break several bank windows, after which the entirety of the associated group would cheer in support as accomplices. Id. at 404. "[S]omeone in the group threw a rock or brick through the window of the police department's Latino Liason unit" with the observed celebration of "everyone in the group" as supportive accomplices. Id. As police approached, "one of the marchers hurled a brick into the windshield of the police cruiser, shattering it. After that, numerous other demonstrators threw objects including rocks and bottles at the police car and police vans." Id.

committing violence or as individual accomplices to the riotous violence, by cheering and raising their arms in encouragement and celebration, id. at 407.

The D.C. Circuit credited the police testimony, the non-moving party "which we must credit at this stage," and concluded on this basis there was evidence to support probable cause to believe that each individual in the arrested group had committed an offense. Id. at 409.

Cohesiveness, as applied by the Carr Court, was based on cohesiveness of conduct and associated *mens rea*, specifically whether "the crowd exhibited [] behavior that could allow a reasonable police office to believe everyone present had committed a crime." Id. at 407. There is nothing in the Carr opinion that dispenses with the need for particularized probable cause or suggests that one person may be arrested for the alleged violation of another or that political association forms a basis to impute culpability.

The D.C. Circuit is emphatic that the Constitutional requirement of individualized particularity is not relaxed where the police undertake a sweeping mass arrest. See Barham v. Ramsey, 434 F.3d 565, 575 (D.C. Cir. 2006) ("Our case law addressing large-scale demonstration scenarios does not suspend - - or even qualify - - the normal operation of the Fourth Amendment's probable cause requirements."). There is no volume discount on constitutional protections based on the sheer number of persons the police seek to arrest.

### C.  It Violates Clearly Established Law for Police to Have Permitted Marchers to Proceed Onto the Roadway of the Bridge and, Without Notice, to Mass Arrest Marchers for Engaging in the Very Conduct Police Permitted

Clearly established law is violated where police permit a march (and in this case, affirmatively lead and escort the march) to be present upon an ordinarily prohibited area and then, just minutes later, arrest the marchers for having marched without permission or for being

in an ordinarily prohibited area. <u>Papineau v. Parmley</u>, 465 F.3d 46, 60 n.6 (2d Cir. 2006) (citing

<u>Cox v. Louisiana</u>, 379 U.S. 559 (1965)).

Otherwise, this would be "an indefensible sort of entrapment by the State – convicting a

citizen for exercising a privilege which the State had clearly told him was available to him." <u>Cox</u>

<u>v. Louisiana</u>, 379 U.S. 559, 571 (1965); <u>Vodak</u>, 639 F.3d at 746-47 (citing <u>Cox</u>, 379 U.S. at 571)

(police effectively waived permit requirement, creating permission to march); <u>Buck v. City of</u>

<u>Albuquerque</u>, 549 F.3d 1269, 1283-84 (10th Cir. 2008) ("officers' conduct essentially amounted

to the grant of a *de facto* parade permit"); <u>Dellums</u>, 566 F.2d at 182-83 n.34 (citing <u>Cox</u>, 379

U.S. at 571) (marchers granted unwritten permit to proceed where, after initially stopping

marchers, police stepped aside and no efforts were made to prevent protesters from continuing).

This is a dominant factual element of the case. The police did not only passively permit

marching activity, police actively and affirmatively permitted it. Ultimately, police conveyed

actual and/or apparent permission for marchers to proceed upon and across the roadway of the

Brooklyn Bridge. Then, without fair notice, they literally did an about-face in the middle of the

Bridge and arrested hundreds for the very conduct which they had been permitting.

Defendants, with an Alice in Wonderland-like repudiation of reality, deny their conduct

notwithstanding plaintiffs' well-pled allegations and video evidence attached by plaintiffs to the

complaint. They direct the Court to look *only* at the TARU video, which is highly selective, and

discredit plaintiffs' allegations and disregard plaintiffs' video, an approach which is

inappropriate under the governing standards.

### 1.  Parading Without a Permit

Defendants mix and match the qualified immunity and <u>Devenpeck</u> analyses with respect

to parading without a permit. Each is addressed separately below.

### a.  Police Did Not Arrest Anyone for Parading Without a Permit; And Therefore No Official Or Doe Defendant Can Claim Qualified Immunity for a Course of Action Not Taken

This is not a case where officers enforced a presumptively constitutional statute, or enforced a statute the constitutionality of which is a matter of unsettled state law. See Ehrlich v. Town of Glaston, 348 F.3d 48, 57-58 (2d Cir. 2003). None of the arresting officers relied on the parading without a permit statute in arresting or charging any member of the putative class.

Since no course of action was chosen by officers in actual or mistaken reliance on the parading without a permit statute, the qualified immunity analysis is inapplicable as to this offense. See Lennon v. Miller, 66 F.3d 416, 421 (2d Cir. 1995) (qualified immunity is concerned with "the 'objective reasonableness' of *their chosen course of action. . .*") (emphasis added). The appropriate legal analysis is to "*turn to the elements of the offense for which [plaintiff] was arrested* . . . to assess the objective reasonableness of the officers' belief that probable cause existed to arrest the plaintiff." Id. at 424 (emphasis added).

Plaintiffs were not arrested for with parading without a permit. Consequently, there is no claim of qualified immunity for having erroneously, but reasonably, arrested on that basis.

### b.  Where Police Permitted Several Thousand Persons to March, Absent Fair Notice and Warnings Issued to the Marchers as a Group, Police Lacked Probable Cause to Arrest for Parading Without a Permit

By permitting marching that is ordinarily prohibited under law, and failing to enforce or arbitrarily enforcing the parading without a permit statute, the police created a situation which denied the putative class of fair notice as to what conduct was being permitted or not permitted at any given moment or location. See Papineau v. Parmley, 465 F.3d 46, 60 (2d Cir. 2006) (quoting City of Chi. v. Morales, 527 U.S. 41, 48 (1999)) ("[T]he purpose of the fair notice requirement [in disorderly conduct statutes] is to enable the ordinary citizen to conform his or her conduct to

9

the law"); United States v. Oakford Corp., 79 F. Supp. 2d 357, 364 (S.D.N.Y. 1999) (failure to enforce law denied fair notice as to what conduct was permitted, was borderline or had in fact "crossed the border").

Defendants appear to argue that, with respect to marching from the park to the bridge, the police did not permit conduct ordinarily prohibited by the parading without a permit statute, and merely allowed marching on the sidewalk. The reality is not so neat. The plain text of the parading without a permit statute prohibits groups of 50 or more from marching on "any public place" including sidewalks. See Allen v. City of N.Y., 2007 U.S. Dis. LEXIS 15, at *19-20 (S.D.N.Y. Jan. 3, 2007). Not only did the police permit sidewalk marching, but at times the NYPD permitted and directed marchers to proceed upon the roadway in ways ordinarily prohibited. SAC ¶81. At some roadway intersections, police blocked vehicular traffic and directed marchers to cross upon the roadway against the traffic signal. SAC ¶82. This was a march that was permitted by police to proceed and was escorted and flanked by police. SAC ¶¶74 - 77. Defendants concede the march was "guided" by police. MTD at 13; SAC ¶78. Marchers relied on police for guidance as to what movement was being arbitrarily permitted or disallowed at any given time or place. SAC ¶¶83-84. Defendants concede the march of several thousand was compliant, that as the march moved towards the bridge, the several thousand marchers "understood orders [regarding movement] and followed them." MTD at 13; SAC ¶80.

With respect to their conveying of permission to proceed upon the roadway of the Brooklyn Bridge, the defendants turn reality upside down and, bizarrely, argue that "the videos conclusively show that plaintiffs and others were not led onto the bridge by the police." MTD at 2. In other words, defendants ask the Court to disregard the well-pled allegations *and* ignore the attached video exhibits, including non-TARU videos taken by witnesses.

Video Exhibit F shows the issuance of inaudible orders to a small subset of persons followed by officers and command staff turning and leading demonstrators onto the bridge roadway. Video Exhibit G shows police physically at the front of the marchers leading them onto the Brooklyn Bridge roadway. The demeanor of the police officials and command staff leading the march was casual and even somewhat jocular. Video Exhibit H shows police somewhat further upon the bridge roadway, still physically at the front of the marchers leading them across the bridge roadway. Police led and escorted marchers onto the bridge roadway. SAC Exhs. F, G, H; SAC ¶¶5, 8, 40, 43, 104 – 114, 116, 118, 119, 121 – 123, 125, 137.

"In these circumstances, no constitutionally valid arrest could have been made until an order to disperse had been given which was itself based on permissible conditions." Dellums v. Powell, 566 F.2d 167, 182-83 (D.C. Cir. 1977) (citing Cox, 379 U.S. at 571-73). Under clearly established law notice is required where permission to march has been granted, or enforcement of prohibitory statutes has been waived.

> The Supreme Court has held decades earlier that police must give notice of revocation of permission to demonstrate before they can begin arresting demonstrators. *Cox v. Louisiana, supra, 379 U.S. at 571-73;* see also *Buck v. City of Albuquerque*, 549 F.3d 1269, 1283-84 (10th Cir. 2008); *Dellums v. Powell*, 566 F.2d 167, 182-83, 184 U.S. App. D.C. 275 (D.C. Cir. 1977).
> Vodak v. City of Chi., 639 F.3d 738, 746 (7th Cir. 2011); See also Parmley, 465 F.3d at 60 n.6.

Even if one assumes, *arguendo*, the constitutionality of parading without a permit as a strict liability offense, the arrest of the putative class still violated clearly established law where police effectively permitted (and affirmatively led and escorted) the conduct and question and then, minutes later, absent fair notice arrested hundreds for that very same conduct.

### c. Devenpeck Provides No Defense to False Arrest Claims Where the Parading Without a Permit Statute is Unconstitutional

Defendants, citing Devenpeck v. Alford, 543 U.S. 146 (2004), assert that the mass arrest is justified nevertheless because probable cause to arrest the putative class existed for violation of the parading without a permit statute, which they contend imposes strict liability.

Devenpeck is inapplicable because the parading without a permit statute is unconstitutional as applied and facially. SAC ¶ 229(c) (alleging unconstitutionality).

As applied, it is unconstitutional to justify the class arrest where permission was granted to march and there was no fair notice of revocation communicated in a manner calculated to reach the entirety of the march regardless of noise and distance.

Facially, the statute is unconstitutional as a strict liability statute.

The ordinance broadly prohibits any procession of 50+ persons "upon any street or in any public place" absent advance written permit from the Police Commissioner. N.Y. City Adm. Code § 10-110(a). Penalties for violation, "upon conviction thereof," include imprisonment of up to ten days or a fine of up to twenty-five dollars. N.Y. City Adm. Code § 10-110(c). See Smith v. California, 361 U.S. 147, 151 (1959) (strict liability is unconstitutional in contexts chilling First Amendment rights, where strict liability may "have the collateral effect of inhibiting the freedom of expression, by making the person more reluctant to exercise it."); Accord Wieman v. Updegraff, 344 U.S. 183, 191 (1952); See also Staples v. United States, 511 U.S. 600 (1994); Oouch v. U.S. Dep't of Homeland Sec., 633 F.3d 119, 125 (2d Cir. 2011) (offenses that do not require mens rea are disfavored); Carr v. District of Columbia, 587 F.3d 401, 410 (D.C. Cir. 2009) (citing United States v. Sheehan, 512 F.3d 621, 631 (D.C. Cir. 2008)) ("We have held that to be criminally liable for parading without a permit, one must do so knowingly."); Am.-Arab Anti-Discrimination Comm. v. City of Dearborn (Dearborn), 418 F.3d 600, 610 (6th Cir. 2005) (declaring parading without a permit ordinance to be facially unconstitutional as imposing strict

liability in context of First Amendment expression); People v. Barrett, 2006 NY Slip Op 26363, 13 Misc. 3d 929, 941-944 (Crim. Ct. N.Y. County 2006) (N.Y. City "Administrative Code § 10-110 Improperly Applies Strict Liability"); People v. Bezjak, 2006 NY Slip Op 26006, 11 Misc. 3d 424, 434-5 (Crim. Ct. N.Y. County 2006) (N.Y. City Admin. Code §10-100 would be constitutionally infirm if it lacked a mens rea requirement; Court finds such a requirement to be required by Penal Law §15.1(2)).

In American-Arab Anti-Discrimination Comm. v. City of Dearborn, the Sixth Circuit reasoned that the imposition of strict liability in a parading without a permit ordinance rendered such ordinance facially unconstitutional. See Dearborn, 418 F.3d at 611-12 (strict liability in this context "is antithetical to our traditions, and constitutes a burden on free expression that is more than the First Amendment can bear.")

Defendants point to People v. Namer, 2006 NY Slip Op 26001, 11 Misc. 3d 409, 415 (Crim. Ct. N.Y. County 2006), in which the Court reasoned that because parading without a permit was only a violation under New York law and not a misdemeanor offense as in Dearborn, strict liability is consistent with the First Amendment regardless that merely approaching a march places a person at risk for ten days' jail time. Namer, 11 Misc. 3d at 828.

The Namer reasoning was explicitly rejected in People v. Barrett, 2006 NY Slip Op 26363, 13 Misc. 3d 929 (Crim. Ct. N.Y. County 2006), which correctly adopted and followed the Circuit Court ruling in Dearborn. "[W]hat matters is not the technical categorization of the offense, but whether its enforcement chills free speech." Barrett, 13 Misc. 3d at 942.

When a person comes upon a march, she does not know whether there has been an advance written permit issued. Under a strict liability framework, that person is faced with a choice. To approach or join the march is to risk the confinement, conditions and humiliation of

13

ten days of imprisonment, the loss of income, familial relationships and contact during that period, potentially the loss of employment due to the absence from work, along with all other harms that flow from such sentence. A person of ordinary firmness will be, at the very least, discouraged from approaching and engaging or associating in with a march. Many people cannot risk such an outcome and have no alternative but to depart the area and not add their voice to otherwise lawful collective political expression. Even if a march has an advance written permit, there is no way for a person to confidently know such is the case. This is extraordinarily chilling. See People v. Bezjak, 11 Misc. 3d at 434 ("Under the City's permit scheme. . . bystanders or onlookers, stirred by the passion evoked by a political march, join it at their peril.")

### 2. Defendants Lacked Probable Cause to Arrest for Disorderly Conduct - Obstructing Vehicular Traffic

Defendants' obstruction of vehicular traffic argument relies, in part, on the demonstrably false claim that marchers were not led onto the roadway. See Exhs. F, G, H; SAC ¶¶5, 8, 40, 43, 104 – 114, 116, 118, 119, 121 – 123, 125, 137 (police led and escorted marchers onto roadway).

It was plainly incompetent or knowingly unlawful for any officer to arrest under circumstances in which the police had themselves led and escorted the marchers onto the bridge roadway; and it was in violation of clearly established law requiring fair notice of revocation of the permission that was conveyed by such police conduct before mass arrests could be made, presuming that they could be made at all. See Parmley, 465 F.3d at 60 n.6; Cox, 379 U.S. at 571.

By leading and escorting marchers onto the bridge roadway, police conveyed actual and/or apparent permission to proceed thereupon, which in turn deprived the putative class of any fair notice that by following the lead of the police command they were engaged in offending conduct. See Parmley, 465 F.3d at 60 (quoting Morales, 527 U.S. at 58) ("The purpose of the fair

14

notice requirement [in disorderly conduct statutes] is to enable the ordinary citizen to conform his or her conduct to the law.")

The defendants concede that disorderly conduct – obstruction of vehicular traffic requires intent or reckless conduct to cause public inconvenience, annoyance or alarm. See MTD at 12. No reasonable officer could arrest for this offense where this *mens rea* was so plainly lacking given police had led and escorted marchers onto and halfway across the bridge.

Although not referenced in defendants' memorandum, marchers were also issued summonses for "failure to obey the lawful order of PO [police officer]." SAC ¶140. There is not even a suggestion by defendants that each was issued an order to not proceed on the bridge.

None of the named plaintiffs were issued warnings to not proceed upon the bridge roadway, SAC ¶41, each followed the crowd onto the bridge roadway, SAC ¶¶116 – 124, plaintiff BECKER observed police leading the march at the front which informed his understanding that they were conveying actual and/or apparent permission to follow, SAC ¶116, plaintiffs CRICKMORE, FEINSTEIN, OSORIO, PEREZ and SOVA each observed police escorting the march across the bridge giving no indication that they were not to proceed alongside, and the remainder of the named plaintiffs were in the midst of the march following the large contingent's movement without being given any indication whatsoever by the police not to so proceed, SAC ¶¶117, 120, 124.

   **D. It Violates Clearly Established Law to Conduct a Mass Arrest of 700+ Persons Where the Target Arrest Group Contained Persons For Whom There Was No Probable Cause to Arrest, Including Persons Who Had Originally Proceeded on the Pedestrian Walkway and Moved to the Roadway Only After Police Conveyed Permission for the Roadway to be Used**

Courts will deny qualified immunity to an official or officer who conducts a mass arrest of protestors absent an objectively reasonable basis to believe that there is probable cause to

arrest each and every one of the group arrestees. See Barham, 434 F.3d at 568 (mass arrest of

386 persons required Chief to have "had particularized probable cause to arrest each of the 386

people caught in the police sweep" absent fair notice, opportunity to comply and refusal to quit;

Dellums, 566 F.2d at 181 nn.30-31(same for group arrest of 1,200 demonstrators); See also

Parmley, 465 F.3d at 60 (quoting Dellums, 566 F.2d at 181 n.31).

Fluidity in and out of the target arrest group destroys any reasonable belief of

cohesiveness of circumstances or probable cause of those therein. See Barham, 434 F.3d at 575.

In the case at bar, hundreds of people flowed onto the roadway following the police lead

without being issued any audible orders to not enter or continue. In addition, police knew that

scores of persons who had originally entered onto the pedestrian walkway of the bridge jumped

the railing and moved onto the roadway when it became clear that police were leading and

escorting and permitting marchers to use the roadway. SAC ¶¶113 – 115; SAC Video Exh. M.

### III. There is No Basis to Dismiss the First Amendment Claims

Defendants argue for dismissal of the First Amendment claims solely on the basis that

there was probable cause or arguable probable cause to arrest under the Fourth Amendment. As

discussed above, the mass arrest violated clearly established law under the Fourth Amendment in

multiple respects. There was no probable cause to arrest the class as a group.

### IV. The Due Process Claim Should Not Be Dismissed

The Supreme Court has held that it is a violation of due process to convict a demonstrator

for demonstrating in an ordinarily prohibited area where police "in effect told the demonstrators

that they could meet where they did." Cox v. Louisiana, 379 U.S. 559, 571 (1965). This due

process violation can be vindicated through the Fourth Amendment where the alleged violation

results in an unlawful seizure and arrest, a proposition with which defendants appear not to

16

disagree. However, given that such constitutes a violation of Due Process, plaintiffs oppose dismissal of the references to due process in the complaint.

### V.  There is No Basis to Dismiss the State Law Claims

#### A.  The Notice of Claim Requirement Does Not Apply to Civil Rights Class Actions

New York State Courts recognize a judicially created exception to the notice requirement for actions brought to "vindicate a public interest." See Union Free Sch. Dist. No. 6 of Towns of Islip & Smithtown v. N.Y. State Human Rights Appeal Bd., 35 N.Y.2d 371, 381 (1974). Actions "which seek relief for a similarly situated class of the public, and whose resolution would directly affect the rights of that class" are exempt. Mills v. County of Monroe, 59 N.Y.2d 307, 311 (1983); See also Pustilnik v. Hynes, 2000 U.S. Dist. LEXIS 8718, at *21 (E.D.N.Y. June 27, 2000). The instant civil rights class action falls squarely within this exemption.

#### B.  Plaintiffs Nevertheless Properly Filed a Notice of Claim

On October 28, 2011, Plaintiffs served a Notice of Claim pertaining to state law claims with the Comptroller's Office. SAC ¶205. After the elapse of over thirty days, on November 30, 2011, Plaintiffs filed their First Amended Complaint which first asserted state law claims. This is in accordance with the requirements of the notice statute under N.Y. General Municipal Law, § 50-e, were they applicable to this civil rights class action. The notice of claim was a condition precedent to the commencement of an action founded upon state tort law.

Defendants object that the original complaint, filed under 42 U.S.C. §1983, was not preceded by a notice of claim. The notice statute excludes from its scope the filing of lawsuits under 42 U.S.C. §1983. N.Y. General Municipal Law, § 50-k(6).

The two cases cited by defendants are inapplicable. Williams v. Nassau County Med. Ctr., 6 N.Y.3d 531, 535 (2006) involved the denial of leave to late file a notice of claim ten years

after the underlying incident. Davidson v. Bronx Mun. Hosp., 64 N.Y.2d 59 (1984) dismissed a suit presenting state law claims where no notice was timely filed and where plaintiff did not avail himself of the opportunity to seek leave to serve a notice of claim *nunc pro tunc*.

## VI. Plaintiffs' Monell Claims for Municipal Liability Should Not be Dismissed

### A. Plaintiffs Have Adequately Pled Plausible and Non-Speculative Bases for Municipal Liability

Defendants argue that municipal liability has not been sufficiently pled. Each of paragraphs 158 through 165 to the SAC allege the maintenance of a distinctive "policy, practice and/or custom" alleged to form the bases of municipal or Monell liability. SAC ¶¶158 - 165.[4] In the absence of discovery, at this pleading stage, plaintiffs do not specify whether each is perpetrated pursuant to formal policy as distinguished from established custom or practice. Regardless of such categorization, the SAC sufficiently pleads that through "its deliberate conduct, the municipality was [a] 'moving force' behind the alleged injury." Roe v. City of Waterbury, 542 F.3d 31, 37 (2d Cir. 2008) (quoting Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 404 (1997)); See also Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011) (municipalities are responsible for "their own illegal acts").

---

[4] Including the policy, practice and/or custom of: disrupting targeted free speech and assembly activity, SAC ¶158; engaging in mass false arrests of protesters in the absence of probable cause, SAC ¶159; engaging in group arrests of protesters in the absence of probable cause to arrest the entire group as a group, and without individualized probable cause to arrest each person within a targeted group, SAC ¶160; engaging in indiscriminate or dragnet-style mass arrests of protestors without regard to existence of probable cause to arrest those targeted, SAC ¶161; engaging in group arrests of protesters without regard as to whether the target group contains persons for whom there is no probable cause to arrest, SAC ¶162; engaging in group arrests of protesters without giving fair notice, warnings or orders to disperse (or to comply with lawful directives) in a manner heard or understood by those subject to arrest, and without giving opportunity to comply, SAC ¶163; tolerating and failing to discipline unlawful police conduct against protesters, including specifically false arrest, SAC ¶164; and justifying arrests of protesters with reference to the parading without a permit statute, which is unconstitutional, SAC ¶165.

It is the unconstitutionality of the "disorder control" tactics, the unconstitutional trap-and-arrest tactics, that is the moving force behind the violations. Whether their unconstitutionality is written directly into their provisions, or the unconstitutional tactics are a deliberate deviation from formal policy is an issue for evidentiary development.

It bears reminder that, at this stage absent discovery, plaintiffs' obligation is to present "enough facts to state claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). A complaint "does not need detailed factual allegations." Id. Yet, the SAC is substantial with factual allegations.

Plaintiffs allege that defendants have created policies, practices or customs under which the unconstitutional violations have occurred. SAC ¶195. In the alternative, defendants knew or should have known of the unconstitutional policies, practices or customs and failed to take corrective action thereby perpetuating the continuation of violations. SAC ¶196.

> A municipal policy may be pronounced or tacit and reflected in either action or inaction. In the latter respect, a "city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution." Connick v. Thompson, 131 S. Ct. at 1360 (internal quotation marks omitted); see also City of Canton v. Harris, 489 U.S. at 396 (O'Connor, J., concurring in part and dissenting in part) ("Where a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of Monell are satisfied."). Consistent with this principle, "where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 126 (2d Cir. 2004) (Sotomayor, J.) (internal quotation marks omitted).

Cash v. County of Erie, 654 F.3d 324, 334 (2d Cir. 2011).

The challenged "disorder control" tactics are directly authored and issued by defendant

KELLY. SAC ¶¶180 – 183, 198. Under Kelly and Bloomberg, these tactics have repeatedly been

deployed to execute mass dragnet-style, indiscriminate group arrests of protesters in the absence

of probable cause. SAC ¶¶184 - 194.

Defendants say plaintiffs have presented only 3 prior incidents of violation. This is

untrue. Plaintiffs allege *hundreds of incidents of false arrest* which occurred *prior* to the October

1, 2011 arrest of 700+ at issue in this case. SAC ¶¶184 - 186, 192 - 194. Defendants deny prior

incidents were sufficiently voluminous to place defendants on notice or to constitute an

intentional pattern or practice created by defendants. But see MacNamara v. City of N.Y., 275

F.R.D. 125, 135 (S.D.N.Y. 2011) (no less than 44 Republican National Convention civil cases

filed and consolidated); id. at 138 (detailing complaints of widespread and pervasive protestor

mass false arrests, exceeding 1,800 for the RNC alone).[5]

Plaintiffs do not merely plead a claim of deliberate indifference.[6] See e.g. SAC ¶195.

They allege the personal involvement of policymaking officials KELLY and BLOOMBERG in

the alleged constitutional deprivations.

---

[5]     The RNC involved persistent and widespread incidents of alleged mass arrests, including
"[o]n August 27, 2004 on Seventh Avenue between 34th and 35th Streets, between 6:30 p.m. and
9:30 p.m." MacNamara, 275 F.R.D. at 133, "[o]n August 27, 2004, on 35th Street between Tenth
Avenue and Dyer Avenue, between 8:00 pm. and 11:00 p.m.," Id., "[o]n August 27, 2004, on
Second Avenue between 9th and 10th Streets, between 8:00 pm. And 11:00 p.m.," Id., "[o]n
August 29, 2004, on 37th Street between Seventh Avenue and Broadway, between 12:00 p.m.
and 3:00 p.m.," Id. at 134,"[o]n August 31, 2004, on Fulton Street between Church and
Broadway," Id., "[o]n August 31, 2004, on 16th Street between Union Square East and Irving
Place, between 7:00 p.m. and 10:00 p.m.," Id., "[o]n August 31, 2004, on 17th Street between
Fifth Avenue and Broadway, between 8:00 and 10:00 p.m.," Id., and "[o]n August 31, 2004, on
35th Street between Fifth and Sixth Avenues, between 7:00 and 10:00 p.m.," Id. at 135.

[6]     Defendants argue that the standard of deliberate indifference "applies to 'pattern' or
'practice' claims." Defs' MTD at 23 (citing Reynolds v. Giuliani, 506 F.3d 183, 192 (2d Cir.
2007)). This is inaccurate. The Reynolds case, and the deliberate indifference standard, apply to
cases "seeking liability based not on affirmative conduct but on a government official's failure to
act." Reynolds, 506 F.3d at 191. In the instant case, plaintiff allege the defendants have adopted
the challenged tactics as a policy, practice or custom, SAC ¶195, and *in the alternative*, knew or

> The personal involvement of a supervisory defendant may be shown by evidence
> that (1) the defendant participated directly in the alleged constitutional violation,
> (2) the defendant, after being informed of the violation through a report or appeal,
> failed to remedy the wrong, (3) the defendant created a policy or custom under
> which unconstitutional practices occurred, or allowed the continuance of such a
> policy or custom, (4) the defendant was grossly negligent in supervising
> subordinates who committed the wrongful acts, or (5) the defendant exhibited
> deliberate indifference to the rights of [persons] by failing to act on information
> that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).

In response to the pre-October 1, 2011 incidents, KELLY approved the use of the tactics.

SAC ¶¶186-187 (KELLY ratified arrests, even where DA admits police led marchers to believe

march was being permitted); SAC ¶191 (KELLY ratifies arrests even after CCRB demand for

training). BLOOMBERG blamed people for approaching protest rather than correcting police

conduct clearly resulting in indiscriminate arrests. See SAC ¶189-190.

Their actions, statements and inactions all evidence defendants' conscious choice, among

municipal policy alternatives, of the adoption and/or continued use of the unconstitutional tactics

challenged herein. SAC ¶¶ 195 - 196. See Okla. City v. Tuttle, 471 U.S. 808, 823 (1985) (a

policy "generally implies a course of action consciously chosen from among various

alternatives").

Had they consciously chosen a different course, a constitutional course, the mass arrest of

over seven hundred people on October 1, 2011 would have been avoided.

The October 1, 2011 mass arrest was a major event of municipal action, coordination and

deployment of City manpower, including the involvement of scores of arresting officers,

command officials, legal counsel, as well as resources and materiel. This is not a case presenting

wrongful unpredictable or uncontrollable conduct by an errant low level officer.

---

should have known of the unconstitutional tactics and failed or omitted to take corrective action,
SAC ¶196. Only the latter is subject to the deliberate indifference standard.

Defendants knew or should have known of this policy, practice or custom of unconstitutional tactics as a consequence of complaints, including civil lawsuits; the occurrence of over 1,800 incidents of false arrest in connection with the RNC in 2004 alone, over 90% of which resulted in dismissals or acquittals; from the millions of dollars paid in resolution of the relatively few complaints that have been resolved; from ordinary after-action reporting and review; from the admission by the District Attorney that in one instance police arrested even though "the police likely created the impression . . . the march had official sanction"; from the demand from the Civilian Complaint Review Board for specific additional training for officers; from major media and front page news articles reporting on indiscriminate mass arrest tactics; and other information. SAC ¶197, 191 (CCRB demand for training), 188 (news media reports)[7].

Even absent evidence of specific adoption or approval by policy-makers, municipal liability can be established where the unconstitutional practice is "so manifest as to imply the constructive acquiescence of senior policy-making officials." Sorlucco v. N.Y. City Police Dep't, 971 F.2d 864, 871 (2d Cir. 1992) (citing St. Louis v. Praprotnik, 485 U.S. 112, 130 (1988) (plurality)). Municipal deliberate indifference to constitutional rights "may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the party of the municipality to investigate or to forestall further incidents." Vann v. City of N.Y., 72 F.3d 1040, 1049 (2d Cir.

---

[7]     See, e.g., Michael Slackman and Diane Cardwell, Police Tactics Mute Protesters and Messages, N.Y. Times, Sept. 2, 2004, at A1 ("Using large orange nets to divide and conquer, and a near-zero tolerance policy for activities that even suggest the prospect of disorder, the New York Police Department has developed what amounts to a pre-emptive strike policy, cutting off demonstrations before they grow large enough, loud enough, or unruly enough to affect the convention."); Michael Powell and Michelle Garcia, Arrests at GOP Convention Are Criticized, Washington Post, September 20, 2004 at A1 ("Officers often sealed off streets with orange netting and used motor scooters and horses to sweep up hundreds of protesters at a time, including many who appeared to have broken no laws. In two cases, police commanders appeared to allow marches to proceed, only to order many arrests minutes later.").

1995); <u>Fiacco v. City of Rensselaer</u>, 783 F.2d 319, 328 (2d Cir. 1986)) ("whether or not the claims had validity, the very assertion of a number of such claims put the City on notice that there was a possibility that its police officers had" violated rights). Even a single incident, if sufficiently egregious, can give rise to an obvious need to act and support a finding of deliberate indifference and municipal liability upon failure to act. <u>Amnesty Am. v. Town of W. Hartford</u>, 361 F.3d 113, 126 (2d Cir. 2004). Given that the pre-October 1, 2011 violations of protesters rights were "open and notorious," they certainly support a finding of deliberate indifference. <u>See Jeffes v. Barnes</u>, 208 F.3d 49, 63 (2d Cir. 2000).

The sheer magnitude of the October 1, 2011 action, including that the conduct on the scene was conducted by command officials, indicate a top-down command decision from which top policy-maker *direct* involvement can be reasonably and sufficiently inferred. Absent discovery, at this stage, evidence of direct involvement and actual decisions, actions and communications are solely in the possession of defendants.

Plaintiffs have, on information and belief, alleged such direct involvement. SAC ¶63 (conferral of BLOOMBERG and KELLY regarding police strategy); SAC ¶67-68 (pre-staging of substantial personnel and materiel); SAC ¶69 (command center monitoring of march as it proceeded); SAC ¶70-71, 201 (KELLY monitored march as it proceeded and communicated with subordinate command officials); SAC ¶199 (on information and belief, KELLY tacitly or explicitly participated in, approved, and/or ratified the mass arrest); SAC ¶202 (KELLY possessed the authority to, but did not ever cause the cessation of the mass arrest).

BLOOMBERG, the following day, admitted that by conducting the 700+ arrests of putative class members "police did exactly what they were supposed to do." SAC ¶205-6; SAC ¶204 (statements evidencing personal control over the NYPD, "my own army," and its tactics).

Defendants do not dispute this statement, but argue that it could not have "caused" the mass arrest since this ratification came after-the-fact. Defendants miss the significance of the statement. BLOOMBERG was specifically comparing the conduct of the mass arrest against the actual and intended policies of the NYPD and CITY OF NEW YORK. He was saying that by perpetrating the mass arrest, the NYPD was carrying out the City's pre-existing policies: that the police were acting pursuant to policy, practice, or custom "exactly" as "they were supposed to."

Post-mass arrest statements are relevant to establish the pre-existing policy or custom alleged to have caused the violations in the underlying instance. "[I]n civil rights actions against a municipality, post-event occurrences can prove 'highly probative' of a pre-existing illegal custom or practice." Liberty Envtl. Svs. v. County of Westchester, 2000 U.S. Dist. LEXIS 13, at *334 (S.D.N.Y. Sept. 15, 2000); See also Larez v. Los Angeles, 946 F.2d 630, 645 (9th Cir. 1991) (To the extent statements of policymaker "shed light on the operation, custom, or policy of his department, or on his ratification or condonation of the injurious acts, his statements. . . may, of course, be used as evidence on the issue of his liability and that of the City.").

Further evidencing their deliberate indifference to the constitutional rights of persons engaged in, or in proximity to, demonstration activity, and their intentional unwillingness to properly train the NYPD, both KELLY and BLOOMBERG have rejected the demands for an investigation into the October 1, 2011 mass arrest, issued by Congressman Jerrold Nadler, the Ranking member of the House Judiciary Committee's Subcommittee on the Constitution, as well as the representative of Lower Manhattan. SAC ¶¶207 - 211. BLOOMBERG called the request for an investigation "ridiculous." SAC ¶210.

### B. Actions by Commissioner Kelly

As described above, plaintiffs have pled on information and belief that KELLY: participated directly in the mass arrest, SAC ¶¶63, 69, 70-71, 199, 201-02; after being informed or having notice of prior violations, see SAC ¶¶194-194, he failed to intervene, SAC ¶¶186-187, 191, 196-97, ultimately causing the October 1, 2011 violations; with knowledge of the October 1, 2011 mass arrest, continues to reject demands for investigation and correction regarding that mass violation, SAC ¶207-209; created the policy or custom under which the unconstitutional practices occurred, SAC ¶180-183, 195, 198 or allowed the continuance of such policies and customs, SAC ¶196-97; was grossly negligent in supervising subordinates who executed the October 1 mass arrests, SAC ¶200; and/or exhibited deliberate indifference to fundamental rights by failing to act on information that unconstitutional acts were occurring, SAC ¶¶183 – 188, 191-194, 196-197, 200-202, 207 – 209, 211. See Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).

### VII. The Failure to Train Claims Are Adequately and Specifically Pled

Defendants complain that the failure to train claims are pled in conclusory fashion. Paragraph 169 of the Second Amended Complaint is anything but conclusory. It identifies very specific manners by which defendants have failed to train.

### Conclusion

For all above reasons, and any others that appear just and appropriate to this Court, the motion to dismiss should be denied in entirety.

Respectfully submitted,

/s/ Carl Messineo
Carl L. Messineo (CM4500)
  cm@justiceonline.org
Mara E. Verheyden-Hilliard (MV7011)
  mvh@justiceonline.org
PARTNERSHIP FOR CIVIL JUSTICE FUND
617 Florida Ave. N.W.
Washington, D.C. 20008
T. 202-232-1180  F. 202-747-7747