UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
KARINA GARCIA, BENJAMIN BECKER,      :
MICHAEL CRICKMORE, MARCEL CARTIER,   :
BROOKE FEINSTEIN, YARI OSORIO,       :
YAREIDIS PEREZ, CASSANDRA REGAN,     :
TYLER SOVA, STEPHANIE JEAN UMOH, as  :
Class Representatives on behalf of   :
themselves and others similarly      :
situated.                            :
                                     :
            Plaintiffs,              :
                                     :
            -v-                      :        11 Civ. 6957 (JSR)
                                     :
MICHAEL R. BLOOMBERG, THE CITY OF NEW :
YORK, RAYMOND W. KELLY, JANE and JOHN :       OPINION AND ORDER
DOE 1-40,                            :
                                     :
            Defendants.              :
                                     :
------------------------------------ x

JED S. RAKOFF, U.S.D.J.

        What a huge debt this nation owes to its "troublemakers." From

Thomas Paine to Martin Luther King, Jr., they have forced us to focus

on problems we would prefer to downplay or ignore. Yet it is often

only with hindsight that we can distinguish those troublemakers who

brought us to our senses from those who were simply . . .

troublemakers. Prudence, and respect for the constitutional rights to

free speech and free association, therefore dictate that the legal

system cut all non-violent protesters a fair amount of slack.

        These observations are prompted by the instant lawsuit, in

which a putative class of some 700 or so "Occupy Wall Street"

protesters contend they were unlawfully arrested while crossing the

Brooklyn Bridge on October 1, 2011. More narrowly, the pending motion to dismiss the suit raises the issue of whether a reasonable observer would conclude that the police who arrested the protesters had led the protesters to believe that they could lawfully march on the Brooklyn Bridge's vehicular roadway.

By way of background, this suit was originally filed on October 4, 2011 by certain of the named plaintiffs, purportedly on behalf of the class of all protesters who were arrested, alleging that the arrests violated the protesters' rights under the First, Fourth, and Fourteenth Amendments. Subsequently, on November 30, 2011, plaintiffs amended their complaint to add additional plaintiffs and claims, but the Court concluded that this First Amended Complaint contained improper material and needed to be revised. Accordingly, on December 12, 2011, the plaintiffs filed a Second Amended Complaint ("SAC"), which is the operative instrument here. On December 23, 2011, the defendants moved to dismiss the Second Amended Complaint. The parties submitted extensive written briefs, and the Court heard oral argument on January 19, 2011. Having now fully considered the matter, the Court grants defendants' motion in part and denies it in part, for the reasons stated below. Specifically, the Court dismisses plaintiffs' "Monell" claims against the City, Mayor Bloomberg, and Commissioner Kelly, but denies the motion to dismiss plaintiffs' claims against the officers who arrested them.

2

The Second Amended Complaint alleges that, on October 1, 2011, thousands of demonstrators marched from Zuccotti Park in downtown Manhattan to the Brooklyn Bridge in order to show support for the Occupy Wall Street movement. SAC ¶ 65. The New York Police Department ("NYPD"), Mayor Bloomberg, and Commissioner Kelly allegedly knew that the protesters planned to march and conferred about how to respond. Id. ¶¶ 63-64. The NYPD accompanied the marchers and prepared its personnel and equipment to ensure that the crowd remained under control. Id. ¶¶ 67-68. The SAC alleges, based on "information and belief," that Commissioner Kelly monitored the march and communicated with subordinates while it proceeded. Id. ¶¶ 70-71.

The NYPD allegedly guided the marchers toward the Brooklyn Bridge. Id. ¶¶ 74-79. Although in the process the police allegedly permitted, and even directed, marchers to violate traffic regulations, id. ¶ 81, this caused no problems because the police had also blocked vehicular traffic in order to accommodate the march, id. ¶ 82. The marchers, in turn, allegedly relied on police officers' commands in order to determine how they could legally proceed. Id. ¶¶ 83-85. When the marchers reached the Brooklyn Bridge, they slowed down because only a few marchers could enter the bridge's pedestrian walkway at the same time. Id. ¶ 88. Police officers initially blocked the eastbound vehicular roadway, preventing marchers from proceeding onto that portion of the bridge. Id. ¶ 90. Subsequently, however, the police officers who had blocked the entrance to the bridge's vehicular

roadway turned and, followed by a large number of marchers, walked onto that portion of the bridge. Id. ¶ 104. After approximately 700 of the marchers had entered the bridge's vehicular roadway, the police restricted the marchers' ability to move forward or backward and arrested them. Id. ¶ 129-130, 134.

The plaintiffs assert, in effect, that they attempted at all times to follow the NYPD's instructions and that they had every reason to believe the police were permitting them to enter the bridge's vehicular roadway. The police, by contrast, assert that they expressly warned the marchers that entering the bridge's vehicular roadway would lead to their arrest. In assessing these competing contentions, the Court, at the parties' behest, has examined two videos of the events. Broder v. Cablevision Sys. Corp., 418 F.3d 187, 196 (2d Cir. 2005).[1]

Plaintiffs' video, apparently filmed by a protester, shows a uniformed police officer speaking into a "bull horn" approximately fifteen feet from the camera, at the Manhattan entrance to the Brooklyn Bridge. SAC Ex. F. Many protesters chant and clap. Id. A whistle blows in the background. Id. A viewer who listens closely can

---

[1] Under applicable precedent, the Court can consider both videos in deciding the motion to dismiss plaintiffs' claims. See Blue Tree Hotels Inv. v. Starwood Hotels & Resorts, 369 F.3d 212, 217 (2d Cir. 2004) (permitting consideration of "any documents that are either incorporated into the complaint by reference or attached to the complaint as exhibits"). Plaintiffs attached their video to the complaint as an exhibit, and acknowledged at oral argument that the complaint also incorporates the defendants' videos by reference. Transcript from January 19, 2012 ("Tr.") at 3:1-3.

understand some of the officer's words over the protester's persistent chants, but not enough to perceive the officer's meaning. Id. Once the officer finishes speaking, he turns his back to the protesters and returns to the line of officers blocking access to the vehicular roadway. Id. After a few moments, the line of officers turns and proceeds onto the vehicular roadway, followed, at a distance of at least ten feet, by hundreds of protesters. Id.

The defendants' video, filmed by the NYPD's Technical Assistance Response Unit ("TARU"), SAC ¶ 113, is shot from behind the officer speaking into the bull horn. Decl. of Arthur G. Larkin dated December 23, 2011 ("Larkin Decl.") Ex. A.[2] In the TARU video, the viewer can clearly hear the officer tell protesters, "Ladies and gentlemen you are obstructing vehicular traffic. If you refuse to move you are subject to arrest." Id. The officer later says, "I am ordering you to leave this roadway now. If you do so voluntarily, no charges will be placed against you." Id. It appears that some of the protesters near the bull horn can hear these warnings, and one at the front asks the officer what offense the officers intend to charge. Id. Others standing farther away, however, appear not to hear the officer or even notice that he has addressed them. Id. After the officer has finished delivering his warnings and rejoined his colleagues blocking

---

[2]The TARU video also shows other interactions between police officers and demonstrators. Larkin Decl. Ex. A. For example, the video shows instances in which officers who are not located at the Brooklyn Bridge instruct demonstrators and other pedestrians to walk only on the sidewalk. Id.

the entry to the vehicular roadway, the demonstrators closest to the camera lock arms. Id. The officers, followed almost simultaneously by the demonstrators, move in the direction of the bridge's vehicular roadway. Id. Photographers run into the space between them to photograph the demonstrators. Id. Both the demonstrators and the police officers remain calm and restrained. Id. Other than the initial warnings given by the officer with the bull horn, the officers and demonstrators do not appear to communicate. Id.

The SAC alleges that, though the NYPD possesses sound equipment capable of projecting a message over several blocks, id. ¶ 103, it did not deploy that technology in this situation, and the great majority of marchers thus could not hear the directives that the officer with the bull horn gave shortly before officers ceased blocking the vehicular roadway. Id. ¶¶ 98-103. Other than the warnings issued from the bull horn, the officers allegedly made no effort to stop marchers from entering the roadway. Id. ¶ 109. Most of the marchers therefore believed, according to the Second Amended Complaint, that they had the NYPD's permission to use the vehicular roadway to cross the bridge. Id. ¶ 112. Of the ten identified plaintiffs bringing this action, nine allegedly did not hear any warning that they could not enter the vehicular roadway,[3] and some of

---

[3]As to the tenth, Cassandra Ryan, the SAC alleges that an officer told Regan to "leave or get arrested," but did so only after she had entered the vehicular roadway and the police had blocked the exit. SAC ¶ 131. Because the timing of the warning Regan received is unclear, the Court, awaiting further factual

them believed that, when the line of officers blocking the entrance to the vehicular roadway turned and started to walk forward on the roadway it was a signal that the NYPD intended to permit marchers to proceed by that route. Id. ¶¶ 116-124. Allegedly, two of the named plaintiffs, Michael Crickmore and Brooke Feinstein, walked onto the vehicular roadway alongside police officers, who made no attempt to warn them about the illegality of their actions. Id. ¶¶ 118-119.

After approximately 700 marchers entered the vehicular roadway, the police officers who had proceeded ahead of the demonstrators stopped. Id. ¶ 127. Although one officer spoke into a bull horn, the SAC alleges that, given the noise, those marchers who were more than a few feet away allegedly could not hear that officer. Id. Officers then blocked all forward and backward movement by the marchers. Id. ¶¶ 129-130. Using orange netting to trap the marchers, the police then arrested the marchers who had entered the vehicular roadway. Id. ¶¶ 130, 136. Officers handcuffed marchers, took them into custody, and processed and released them, giving each a summons that indicated that the officers had seen the marcher commit one or another offense, such as failure to obey a lawful order. Id. ¶¶ 136-140.

The SAC also alleges that the City has a policy, practice, or custom of arresting large groups of protesters in the absence of probable cause in order to disrupt mass demonstrations. Id.

---

development, treats Regan similarly to the other plaintiffs for the limited purposes of this motion.

¶¶ 158-160. In 1993, Commissioner Kelly published the "Disorder Control Guidelines," which have guided the NYPD in its responses to both violent riots and peaceful assemblies. Id. ¶ 181. Utilizing these guidelines, the City, according to the SAC, has allegedly engaged in mass false arrests, frequently using orange nets to trap protesters. Id. ¶¶ 182-183. For example, the SAC alleges that, on April 7, 2003, the NYPD indiscriminately trapped and arrested demonstrators who protested the invasion of Iraq. Id. ¶ 184. Similarly, the SAC alleges that the NYPD indiscriminately arrested protesters at the 2004 Republican National Convention ("RNC"), but could not press charges against many arrestees because officers had given demonstrators the impression that the march had official sanction. Id. ¶¶ 185-186. According to the SAC, Mayor Bloomberg and Commissioner Kelly knew of these mass arrests and approved or ratified them. Id. ¶¶ 187-191. The SAC also notes that, one week before the arrests at issue in this case, the police surrounded and arrested thirty to forty protesters related to the Occupy Wall Street movement in Greenwich Village. Id. ¶¶ 192-193.

Finally, the SAC alleges that Mayor Bloomberg and Commissioner Kelly knew of and either approved in advance or subsequently ratified the October 1, 2011 arrests. Id. ¶¶ 198-205. Both have allegedly rejected calls for an investigation into whether those arrests deprived demonstrators of constitutional rights. Id. ¶ 209. Alternatively, the SAC alleges that Mayor Bloomberg and Commissioner

Kelly failed to properly train officers regarding constitutional

prohibitions against indiscriminate arrests. Id. ¶ 169.

A motion to dismiss under Rule 12(b)(6) tests not the truth of

a complaint's allegations, but only their legal sufficiency to state a

claim. Specifically, a court must assess whether the complaint

"contain[s] sufficient factual matter, accepted as true, to 'state a

claim to relief that is plausible on its face.'" Ashcroft v. Iqbal,

129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550

U.S. 544, 570 (2007)). Mere conclusory statements in a complaint and

"formulaic recitation[s] of the elements of a cause of action" are not

sufficient. Twombly, 550 U.S. at 555. Thus, a court discounts

conclusory statements, which are not entitled to the presumption of

truth, before determining whether a claim is plausible. Iqbal, 129 S.

Ct. at 1949-50. "A claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged."

Id. at 1949. "Determining whether a complaint states a plausible claim

for relief will . . . be a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense."

Id. at 1950.

In their motion to dismiss, the defendants, in addition to

arguing that the Second Amended Complaint fails to state a claim,

raise the defense of qualified immunity. "The doctrine of qualified

immunity protects government officials 'from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." Saucier v. Katz, 533 U.S. 194, 200 (2001), overruled in part on other grounds by Pearson, 555 U.S. 223. When the defense of qualified immunity is raised as part of a 12(b)(6) motion, a court must decide whether the complaint has plausibly alleged that the government official claiming immunity violated a constitutional right and whether that right was "clearly established" at the time of the alleged misconduct. Id. at 232.

Against this background, the defendant police officers argue, first, that the SAC fails to adequately allege a violation of the Fourth Amendment (which the Fourteenth Amendment makes applicable to state and local governments), and, second, that, even if a substantive offense is adequately pleaded, the defendants are entitled to qualified immunity. Under the Fourth Amendment, officers can arrest a suspect only on the basis of probable cause. Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996). "[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has

committed or is committing a crime." Id. When determining whether
probable cause exists, courts must consider those facts available to
the officer at the time of arrest and base their analyses on the
"totality of the circumstances." Caldarola v. Calabrese, 298 F.3d 156,
162 (2d Cir. 2002).[4] "[T]he existence of probable cause is an absolute
defense to a false arrest claim." Jaegly v. Couch, 439 F.3d 149,
151-52 (2d Cir. 2006).

In the context of peaceful demonstration, the First Amendment
affects the determination of when an officer has probable cause to
arrest under the Fourth Amendment. The Supreme Court has long held
that in such a context laws and regulations must "give citizens fair
warning as to what is illegal." Cox v. Louisiana, 379 U.S. 559, 574
(1965). Indeed, because of the tension between First Amendment
protections and local laws aimed at preventing disruption, difficult
questions frequently arise as to the applicability to protest marchers
and demonstrators of laws that require parade permits or that
criminalize disruption of the peace. As a result, "fair warning as to
what is illegal" often comes not from the legislative bodies that

---

[4]Just as an officer's subjective intent does not determine
whether a prudent person would have concluded that probable cause
existed, so too the offense that an officer cites at the time of
the arrest need not be the same as, or even "closely related" to,
the offense for which the officer has probable cause to arrest.
Devenpeck v. Alford, 543 U.S. 146, 153-55 (2004). Accordingly,
the mere fact that many plaintiffs here were initially charged
with failure to obey a lawful order does not prevent defendants
from justifying the arrests based on probable cause to arrest for
a different crime.

draft the potentially relevant laws, but instead from the executive officials who enforce them. For example, in <u>Cox</u>, police officers told demonstrators that, if they protested across the street from a courthouse, they would not violate a prohibition on protesting "near" the courthouse. <u>Id.</u> at 569-70. Without deciding whether, in the absence of advice from police, the demonstrators might have violated the prohibition, the Supreme Court held that "to sustain appellant's later conviction for demonstrating where they told him he could 'would be to sanction an indefensible sort of entrapment by the State -- convicting a citizen for exercising a privilege which the State had clearly told him was available to him.'" <u>Id.</u> at 571-72 (quoting <u>Raley v Ohio</u>, 360 U.S. 423, 426 (1959)).

Courts of appeal have likewise confirmed demonstrators' rights to "fair warning" that their conduct violates the law. For example, the Tenth Circuit has found that, where ordinances prohibited walking in a street and parading without a permit, police officers who closed streets in anticipation of a march and directed the procession effectively "sanctioned the protesters walking along the road and waived the permit requirement." <u>Buck v. City of Albuquerque</u>, 549 F.3d 1269, 1283-84 (10th Cir. 2008). Similarly, where police officers used bull horns to advise a large mass of protesters to either adhere to a specific but previously unannounced route or disperse, officers could not arrest protesters who did not take that route because "there was no mechanism (at least no mechanism that was employed) for conveying a

12

command to thousands of people." <u>Vodak v. City of Chicago</u>, 639 F.3d
738, 745-46 (7th Cir. 2011) (Posner, J.). In each of these
circumstances, police did not give the "notice of revocation of
permission to demonstrate" that was required before they could "begin
arresting demonstrators." <u>Id.</u> at 746.

In the Second Circuit, the leading applicable case is <u>Papineau
v. Parmley</u>, 465 F.3d 46 (2d Cir. 2006). <u>Papineau</u> involved a case in
which a protest originated on private property bordering on an
interstate highway but spilled over onto the highway when a small
group of protesters walked onto the interstate, attempting to
distribute leaflets. <u>Id.</u> at 52. These actions potentially violated
state law. <u>Id.</u> at 59. Shortly after the group abandoned its attempts
to distribute leaflets on the interstate, a large number of police
officers began to disperse all of the protesters, arresting those who
failed to comply. <u>Id.</u> at 53. The Second Circuit, in an opinion written
by then-Judge Sonia Sotomayor, held that "even if the [officers] had a
lawful basis to interfere with the demonstration," the demonstrators
"still enjoyed First Amendment protection, and absent imminent harm,
the troopers could not simply disperse them without giving fair
warning." <u>Id.</u> at 60.

Despite some differences,[5] these cases all stand for the basic

_____

[5] <u>Papineau</u> differs from <u>Vodak</u> and <u>Buck</u> in two respects. In
<u>Papineau</u>, the plaintiffs did not argue that the officers had
given them apparent permission to demonstrate on the highway. 465
F.3d at 58. On the other hand, many plaintiffs had not entered
the interstate at all. The Second Circuit expressed considerable

proposition that before peaceful demonstrators can be arrested for violating a statutory limitation on the exercise of their First Amendment rights, the demonstrators must receive "fair warning" of that limitation, most commonly from the very officers policing the demonstration. Relatedly, when, as here, the defense of qualified immunity is raised as part of a motion to dismiss, the question the Court must then answer is: would it be clear to reasonable police officers, in the situation the defendant officers confronted, that they lacked probable cause to believe (i) that the plaintiff demonstrators had committed a crime and (ii) that the plaintiff demonstrators had received fair warning?

The first prong is easily satisfied because, even on the face of the Second Amended Complaint, there are two criminal statutes that plaintiffs seemingly transgressed. To begin with, the plaintiffs conducted a parade without a permit. Under N.Y. City Admin. Code § 10-110(a), "[a] procession, parade, or race shall be permitted upon any street or in any public place only after a written permit therefor has been obtained from the police commissioner." A parade means "any procession or race which consists of a recognizable group of 50 or more pedestrians . . . proceeding together upon any public street or

---

skepticism concerning whether the intrusions of a few would justify the officers' decision to disperse the entire protest, id. at 59, but also concluded in the alternative that, even if those intrusions justified dispersal, the officers had nonetheless failed to give the required "fair warning," id. at 60.

roadway," 38 R.C.N.Y. § 19-02(a), and the Second Amended Complaint avers that more than fifty demonstrators proceeded together on a public street, SAC ¶¶ 65-66. Section 10-110(c) of the Code provides that "[e]very person participating in any procession, parade or race, for which a permit has not been issued when required by this section, shall, upon conviction thereof, be punished by a fine of not more than twenty-five dollars, or by imprisonment for not exceeding ten days, or by both such fine and imprisonment."

Additionally, the plaintiffs engaged in disorderly conduct. Under N.Y. Penal Law § 240.20(5) (the same provision at issue in Papineau), a "person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . [h]e obstructs vehicular or pedestrian traffic." The Second Amended Complaint avers, in effect, that the plaintiff demonstrators walked onto the Brooklyn Bridge's vehicular roadway at a time when vehicles were driving there. SAC ¶ 109; see also Larkin Decl. Ex. A.

The SAC does adequately allege, however, that the individual plaintiffs and the great majority of the plaintiff class failed to receive fair warning. See SAC ¶¶ 92-124. The more difficult question is with respect to the second prong of the qualified immunity defense, namely, whether a reasonable officer could have believed, based on the facts known to defendants, that the plaintiffs received fair warning. With respect to the alleged violation of the parade permit

15

requirement, N.Y. City Admin. Code § 10-110(c), the defendants cannot reasonably contend, given plaintiffs' allegations, that they did not knowingly allow the march to proceed even in the absence of a permit. Indeed, the defendants acknowledge that, in the few warnings the officers gave, they identified marching as permissible conduct, and prohibited only marching on the vehicular roadway. The officer with the "bull horn" advised protesters "to leave this roadway now. If you do so voluntarily, no charges will be placed against you." Larkin Decl. Ex. A (emphasis added). Marching without a permit, then, simply was not a problem, and no reasonable officer would have thought that the plaintiffs received a warning to the contrary.

With respect to the alleged disorderly conduct violation, N.Y. Penal Law § 240.20(5), the plaintiffs have alleged, and the videos submitted by each side show, that the NYPD exercised some degree of control over the marchers, defining their route and directing them, at times, to follow certain rules. SAC ¶¶ 74-79. In certain instances, the police even directed marchers to violate traffic regulations, id. ¶ 81, which, however, caused no problems because the police had also blocked vehicular traffic in order to accommodate the march, id. ¶ 82.[6] The marchers, in turn, allegedly relied on the police officers' commands in order to determine how they could legally proceed. Id.

---

[6]The defendants point out that the TARU videos show that some of the officers repeatedly asked the demonstrators to proceed on the sidewalk when possible. Larkin Decl. Ex. A. But this must be assessed in the context of the police at other times directing the marchers to violate traffic regulations.

¶¶ 83-85.

Under these circumstances, a reasonable officer would have understood that it was incumbent on the police to clearly warn the demonstrators that they must not proceed onto the Brooklyn Bridge's vehicular roadway.[7] While, initially, the police officers congregated at the entrance to the bridge's vehicular roadway, thus effectively blocking the demonstrators from proceeding further, SAC Ex. F, the officers then turned and started walking away from the demonstrators and onto the roadway -- an implicit invitation to follow. While the demonstrators might have inferred otherwise if they had heard the bull-horn message, no reasonable officer could imagine, in these circumstances, that this warning was heard by more than a small fraction of the gathered multitude. Here, as in Vodak, a single bull horn was "no mechanism . . . for conveying a command" to the hundreds, if not thousands, of demonstrators present. 639 F.3d at 745-46. Indeed, the plaintiffs' video shows what should have been obvious to any reasonable officer, namely, that the surrounding clamor interfered with the ability of demonstrators as few as fifteen feet away from the bull horn to understand the officer's instructions. SAC Ex. F.

---

[7] Any warning police officers gave after demonstrators had already proceeded halfway across the bridge could not have provided "fair warning." After demonstrators entered the bridge, police allegedly prevented them from retreating, sealing their fate. Id. ¶¶ 130-131. Implicit in the notion of "fair warning" is an opportunity for plaintiffs to conform their conduct to requirements. See City of Chicago v. Morales, 527 U.S. 41, 58 (1999).

Even though most demonstrators could not hear the instruction not to enter the roadway, one might argue that common sense would warn them that they could not walk onto the part of the bridge reserved for, and in fact used by, vehicles. The circumstances here, however, rebut that argument. As described above, police officers defined what rules demonstrators had to follow under the circumstances. Having not heard any warning, many demonstrators watched as police officers abandoned their previous position and proceeded ahead of demonstrators onto the bridge's vehicular roadway. Id. Eventually, some demonstrators even walked beside the officers who were on the vehicular roadway, id. ¶ 119, and those officers allegedly did not offer any warning that the demonstrators faced imminent arrest as a result of their present conduct. Id. The pictorial and video evidence submitted by the parties shows that these allegations are plausible. Id. Exs. I, J, K; see also Larkin Decl. Ex. A. Assuming the truth of plaintiffs' allegations, the officers' "direction of the procession sanctioned the protesters walking along the" vehicular roadway, depriving the protesters of any warning that the officers regarded their conduct as illegal. Buck, 549 F.3d at 1284.

Finally, the defendants argue that, even if many of the 700 demonstrators whom the officers arrested did not receive any warning, nevertheless, since at least a few of the demonstrators undoubtedly did receive a warning, the circumstances permitted the officers to treat the demonstrators as a group. For this argument, defendants rely

on Carr v. District of Columbia, which held that "[p]olice witnesses must only be able to form a reasonable belief that the entire crowd is acting as a unit and therefore all members of the crowd violated the law." 587 F.3d 401, 408 (D.C. Cir. 2009). In that case, however, "it appeared to officers as if the entire crowd was rioting or encouraging riotous acts." Id. at 410 n.6. Thus, the D.C. Circuit found no First Amendment protection attached because resort to and encouragement of violence forfeited any such protection. Id. (citing Grayned v. City of Rockford, 408 U.S. 104, 116 (1972)). Here, the defendants do not suggest, and the videos do not show, that the demonstrators engaged in any kind of violence or otherwise endangered their own or others' safety. To the contrary, both the demonstrators and the officers appeared calm and restrained. While rioters hardly need fair warning that their violent behavior violates the law, peaceful demonstrators who are otherwise complying with police direction require fair warning before they can be arrested for alleged noncompliance.

Indeed, the Second Circuit, in Papineau, expressly rejected the argument that "the fact that some demonstrators had allegedly violated the law" permitted officers to disperse a larger, lawful crowd. 465 F.3d at 57. Instead, the Second Circuit noted that "the police may not interfere with demonstrations unless there is a 'clear and present danger' of riot, imminent violence, interference with traffic or other

immediate threat to public safety." Id.[8] Moreover, the Second Circuit found that, in the absence of "imminent harm," even officers with a "lawful basis" for ordering dispersal must still give demonstrators "fair warning." Id. at 60.

The same logic applies here. Because the defendants have not argued that plaintiffs posed a threat of imminent harm, they have shown neither that circumstances would have alerted demonstrators to the illegality of their conduct nor that mass arrest served some pressing law enforcement need. A finding that the ordinary need to facilitate vehicular traffic permitted officers to impute "fair warning" to all protesters would eviscerate the requirement of such warning. Indeed, such a finding would allow the arrest of those who participated in a demonstration that, unbeknownst to them, lacked a parade permit, a claim courts have consistently rejected. See Buck, 549 F.3d at 1283-84; Am.-Arab Anti-Discrimination Comm. v. City of Dearborn, 418 F.3d 600, 613 (6th Cir. 2005) ("[W]e hold that the Ordinance, on its face, violates the First Amendment by holding

---

[8]While the Second Circuit lists "interference with traffic" among the "threat[s] to public safety" that justify immediate intervention, the videos submitted show that the interference that occurred in this case did not constitute a "clear and present danger" to anyone's safety. As demonstrators proceeded onto the bridge, the officers accompanying them formed a barrier between them and the vehicular traffic, which slowed. SAC Exs. I, J, K; see also Larkin Decl. Ex. A.  Thus, while the demonstrators may have delayed traffic from proceeding, the available record does not show that they endangered themselves or others. In any event, the available record indicates that many of the 700 arrestees came nowhere near cars. Some even arrived on the bridge only after police had stopped traffic.

participants in a march along public rights of way strictly liable if the march proceeds without a permit.").

For the reasons described above, the allegations of the Second Amended Complaint, if true, establish that the officers did not give fair warning to the overwhelming majority of the 700 demonstrators who were arrested in this case. Nor, given the allegations of the Second Amended Complaint, are any of the defendant police officers entitled to qualified immunity at this stage. A reasonable officer in the noisy environment defendants occupied would have known that a single bull horn could not reasonably communicate a message to 700 demonstrators. Furthermore, a reasonable officer would have known that those who did not hear any warning might infer permission to enter the vehicular roadway from the fact that officers, without offering further warnings, proceeded ahead of and alongside plaintiffs onto that roadway. Each of the circuit court cases described above found that demonstrators' right to "fair warning" was "clearly established." Vodak, 639 F.3d at 746-47; Buck, 549 F.3d at 1286-87; Papineau, 465 F.3d at 61. The circumstances of this case barely differ from those in Vodak, Buck, and Papineau, and no difference among the cases would have suggested to a reasonable officer either that she did not need to give fair warning in these circumstances or that the defendants had adequately given such warning to more than a small fraction of demonstrators. Thus, the Court denies the defendants' motion to dismiss plaintiffs' claims under the First, Fourth, and Fourteenth

21

Amendments.[9]

Similar analysis leads the Court to deny defendants' motion to dismiss plaintiffs' state law claims. The defendants identify two potential bases for dismissal of these claims. First, they invoke state law qualified immunity as a defense. "New York law . . . grant[s] government officials qualified immunity on state-law claims except where the officials' actions are undertaken in bad faith or without a reasonable basis." Papineau, 465 F.3d at 63. Here, the same allegations that plausibly suggest that a reasonable officer would have clearly known that the arrests violated plaintiffs' rights also suggest that defendants acted "without a reasonable basis." See id. ("[D]efendants' [state law immunity] defense would necessarily depend on the same 'reasonableness' at issue with respect to Plaintiffs' federal claims.").

Second, defendants argue that plaintiffs failed to comply with

_____

[9]This conclusion, incidentally, does not depend in any way on a finding that the police actually intended to lead demonstrators onto the bridge. Indeed, the videos themselves seemingly negate plaintiffs' suggestion that the police orchestrated a "charade" designed to create a pretense for arrest. Cf. SAC ¶¶ 2, 7. Rather, they are more consistent with the theory that the police believed they could better control the crowd at a later point. For present purposes, however, what motivated the officers to retreat from their position at the entrance to the vehicular roadway does not matter. The officers putatively violated the First and Fourth Amendments when, having maintained their control over a peaceful demonstration, they imposed the serious sanction of arrest on many who, while attempting to exercise their First Amendment rights, never received fair notice that the officers had prohibited their conduct.

N.Y. Gen. Mun. Law § 50-e, which requires those who seek to sue the

City or its officers to notify the City of its claim. Nonetheless:

> actions that are brought to protect an important right,
> which seek relief for a similarly situated class of the
> public, and whose resolution would directly affect the
> rights of that class or group are deserving of special
> treatment. The interests in their resolution on the merits
> override the State's interest in receiving timely notice
> before commencement of an action.

Mills v. Cnty. of Monroe, 59 N.Y.2d 307, 311 (1983). Because

plaintiffs assert an important and directly affected right on behalf

of a class, § 50-e does not apply, and the Court denies defendants'

motion to dismiss plaintiffs' state law claims.

Turning finally to plaintiffs' claims against Mayor Bloomberg,

Commissioner Kelly, and the City for supervisorial and municipal

liability, plaintiffs have failed to allege "factual content that

allows the court to draw the reasonable inference" that the defendants

are liable on such claims. Iqbal, 129 S. Ct. At 1949. Although,

plaintiffs argue that they have adequately alleged claims against

Bloomberg, Kelly, and the City on three separate theories, none is

persuasive.

First, they argue that the existence of "Disorder Control

Guidelines," the arrests of protesters in 2003 and 2004, and the

arrests a week before the incident in this case all indicate that the

City has a policy of conducting mass false arrests in order to

discourage protesting. SAC ¶¶ 180-193. As they note, "[l]ocal

governing bodies . . . can be sued directly under § 1983 for monetary,

declaratory, or injunctive relief where . . . the action that is
alleged to be unconstitutional implements or executes a policy
statement, ordinance, regulation, or decision officially adopted and
promulgated by that body's officers." <u>Monell v. Dep't of Soc. Servs.</u>,
436 U.S. 658, 690 (1978) (footnote omitted). "<u>Monell</u>'s policy or
custom requirement is satisfied where a local government is faced with
a pattern of misconduct and does nothing, compelling the conclusion
that the local government has acquiesced in or tacitly authorized its
subordinates' unlawful actions." <u>Reynolds v. Giuliani</u>, 506 F.3d 183,
192 (2d Cir. 2007).

Here, however, plaintiffs have not plausibly alleged that
officers' conduct in this case constituted part of a "pattern of
misconduct," about which Bloomberg, Kelly, and the City did nothing.
The breadth with which plaintiffs define the alleged policy
underscores its implausibility. Plaintiffs argue that the defendants
have acquiesced in or tacitly authorized "indiscriminate mass false
arrest of groups of protesters in the absence of individualized
probable cause." SAC ¶ 189. Here, however, out of thousands of
protesters, the police officers arrested only the 700 who proceeded
onto the Brooklyn Bridge's vehicular roadway. While, as described
above, the officers may have violated protesters rights by depriving
them of "fair warning," this does not mean that they acted
indiscriminately. As noted above, the videos themselves rebut
plaintiffs' allegations that officers engaged in a "calculated effort

24

to sweep the streets of protesters and disrupt a growing protest movement." Id. ¶ 2. Plaintiffs have not explained why the implementation or execution of a policy of "indiscriminate mass false arrest of protesters" would have produced the relatively narrow set of arrests in this case.

The plaintiffs cannot bridge the gap between the broad, conspiratorial policy they attribute to the City and the violations that they have plausibly alleged in this case. Their meager attempts to do so fail. For example, plaintiffs suggest that the "Disorder Control Guidelines" allegedly issued by Commissioner Kelly "initiated" the use of orange netting to contain protesters and rioters. Id. ¶¶ 180-183. Use of orange netting to contain protesters, however, does not by itself violate the Constitution, and it has nothing to do with whether protesters have received fair warning of what the law requires. Further, plaintiffs allege that, in 2004, officers unconstitutionally arrested protesters for participating in an unpermitted march that the police had apparently sanctioned. Id. ¶¶ 185-186. Here, however, notwithstanding defendants' argument that violation of the permit regulations provided a basis for arrest, officers did not arrest marchers under permit regulations, as the distinction between marchers who entered the bridge's vehicular roadway and those who did not makes clear. As for plaintiffs' final two allegations concerning prior misconduct, plaintiffs allege in conclusory fashion that "[w]ithout warning or notice," police officers

surrounded and arrested large groups of protesters. Id. ¶¶ 184, 193.
Plainly, without additional factual content, these allegations cannot
provide a plausible basis to conclude that the City either had or
tolerated a policy of failing to provide fair warning, much less that
the officers implemented such a policy in this case.

Thus, even if plaintiffs have plausibly alleged that the City
"acquiesced in or tacitly authorized" a pattern of mass false arrests
designed to discourage protesting -- and the Court does not find that
they have adequately so alleged -- the plaintiffs have failed to
connect that pattern with the arrests in this case. Simply put, while
the police failed to give plaintiffs fair warning before they arrested
them, plaintiffs have neither plausibly alleged that the officers
intended to discourage protesting nor explained why, had they intended
to do so, they would have arrested only the protestors who entered the
bridge's vehicular roadway. Even if the Court charitably interpreted
the SAC to allege that the City tolerated a "pattern" of failure to
provide fair warning, the one factual example plaintiffs have
provided, which involved circumstances that differed from those in
this case, cannot provide the basis for a Monell claim. See Green v.
City of New York, 465 F.3d 65, 81 (2d Cir. 2006). Accordingly,
plaintiffs have not plausibly alleged that the violations in this case
resulted from a policy that Mayor Bloomberg, Commissioner Kelly, or
the City implemented, executed, or tolerated.

Second, plaintiffs argue that Mayor Bloomberg and Commissioner

Kelly either ratified or directly participated in the alleged
constitutional violations. Under Iqbal, plaintiffs may not base § 1983
claims on a theory of respondeat superior, but must instead show that
a supervisory "official's own individual actions" subject him to
liability. Iqbal, 129 S. Ct. at 1948. Policymakers face liability only
where "a deliberate choice to follow a course of action is made from
among various alternatives by the official or officials responsible
for establishing final policy." Pembaur v. City of Cincinnati, 475
U.S. 469, 483 (1986).

Plaintiffs have not met this demanding standard. With respect
to Commissioner Kelly, plaintiffs allege, on "information and belief,"
that he "participated in, approved and/or ratified" the officers'
conduct. SAC ¶ 199. These very different courses of action, apparently
pled in the alternative, only underscore the observation that
plaintiffs have not alleged any facts concerning Commissioner Kelly's
conduct. Similarly, plaintiffs' allegations that Mayor Bloomberg and
Commissioner Kelly conferred about how police would respond to
"protest marches" in general, id. ¶ 63, cannot remotely indicate that
either one made "a deliberate choice to follow a course of action"
that resulted in the arrest of these particular plaintiffs at this
particular march. Finally, plaintiffs' allegations that Mayor
Bloomberg and Commissioner Kelly ratified the arrests after they
occurred cannot constitute participation in or election to follow an
unconstitutional course of conduct. Only where supervisors and

policymakers can "rectify the situation" does ratification create a basis for liability. Cf. Amnesty Am. v. Town of West Hartford, 361 F.3d 113, 128 (2d Cir. 2004). Accordingly, plaintiffs have not stated a claim against Mayor Bloomberg or Commissioner Kelly based on their participation in or ratification of the alleged violations.

Finally, the plaintiffs argue that Mayor Bloomberg and Commissioner Kelly face liability based on their failure to train the arresting officers. "[A] municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011) (quoting Canton v. Harris, 489 U.S. 378, 388 (1989)). To satisfy the deliberate indifference standard, a plaintiff must show that an officer's actions were "clearly unreasonable in light of the known circumstances." Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 648-49 (1999). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." Connick, 131 S. Ct. at 1360 (quoting Bd. of Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 409 (1997)).

Plaintiffs' claim of failure to train must fail for substantially the same reasons that their claim based on an alleged municipal policy failed. While plaintiffs allege that the named defendants did not properly train officers "to give fair notice prior

28

to the initiation of mass protest arrests," SAC ¶ 169, they describe only one other circumstance in which officers allegedly arrested protesters in the absence of fair warning, id. ¶ 186. Given the differences described above between those circumstances and the events alleged here, plaintiffs simply have not plausibly alleged a "pattern of similar constitutional violations" that rendered Mayor Bloomberg's and Commissioner Kelly's actions "clearly unreasonable in light of known circumstances." Accordingly, the plaintiffs have not stated a claim against either defendant for failure to train. Since the plaintiffs have failed to state a plausible claim under any of their three proposed theories, the Court dismisses their Monell claims against the City, Mayor Bloomberg, and Commissioner Kelly.

In sum, for the reasons stated above, the Court denies defendants' motion to dismiss plaintiffs' claims against the officers who arrested them, but grants the motion to dismiss plaintiffs' Monell claims against the City, Mayor Bloomberg, and Commissioner Kelly. The Clerk of the Court is hereby ordered to close items number 7 and 14 on the docket of this case. The Court directs the parties to jointly call Chambers no later than June 15, 2012 to schedule further proceedings in this case.

SO ORDERED.

_____

JED S. RAKOFF, U.S.D.J.

29

```
Dated:  New York, New York

        June  7 , 2012
```